*Decision will be entered under Rule 50.*

ROBERT J. DIAL, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 47332–47335.    Filed April 29, 1955.

[1] Proceedings of the following petitioners are consolidated herewith:

| Petitioners | Docket Nos. |
|---|---|
| Robert J. Dial and Mary W. Dial | 47333 |
| Dwight S. Spreng | 47334 |
| Dwight S. Spreng and Elizabeth D. Spreng | 47335 |

*Wallace B. Heiser, Esq.*, for the petitioners.
*Theodore E. Davis, Esq.*, for the respondent.

RICE, *Judge:* These consolidated proceedings involve the following contested deficiencies in income tax determined by the respondent:

| Docket No. | Taxpayer | Year | Deficiency |
|---|---|---|---|
| 47333 | Robert J. Dial and Mary W. Dial | 1945<br>1946 | $30,229.96<br>439.54 |
| 47332 | Robert J. Dial | 1947 | 28.45 |
| 47334 | Dwight S. Spreng | 1944 | 5,122.99 |
| 47335 | Dwight S. Spreng and Elizabeth D. Spreng | 1945<br>1946 | 32,514.37<br>547.24 |

The main issue raised by the pleadings is whether mortgage notes or bonds issued to petitioners Robert J. Dial and Dwight S. Spreng in 1945 by the Lorain Avenue Clinic were in payment of past salary and other indebtedness owed by it to petitioners, and, if so, to what extent such notes or bonds constituted income to them for that year. If the answer to the first issue is "no," two alternative issues arise as to whether petitioner Dwight S. Spreng constructively received income in 1944 in the amount credited to his salary account during that year; and whether the amounts of principal paid on such bonds in 1947 constituted income to petitioners Robert J. Dial and Dwight S. Spreng in that year. The fourth issue is whether petitioners Dwight S. Spreng and Elizabeth D. Spreng received additional interest income of $75.75 in 1946. The final and fifth issue is whether the sale of real

estate by the Lorain Avenue Clinic to petitioners Mary W. Dial and Elizabeth D. Spreng in 1946 for the amount of the book value of such property resulted in the receipt by petitioners of income to the extent that the fair market value of such property, as determined by the respondent, exceeded such book value.

Petitioner Robert J. Dial claimed an overpayment of tax for the year 1947.

Some of the facts were stipulated.

FINDINGS OF FACT.

The stipulated facts are so found and are incorporated herein by this reference.

Petitioners Robert J. Dial (hereinafter referred to as Robert) and his wife, Mary W. Dial (hereinafter referred to as Mary), were residents of Cleveland, Ohio, during the years in issue as were petitioners Dwight S. Spreng (hereinafter referred to as Dwight) and his wife, Elizabeth D. Spreng (hereinafter referred to as Elizabeth). All petioners filed their returns for such years on the cash receipts and disbursements basis with the collector of internal revenue in Cleveland. Robert and Mary filed joint returns for 1945 and 1946, and Robert filed an individual return for 1947. Dwight filed an individual return for 1944, and he and Elizabeth filed joint returns for 1945 and 1946.

Robert and Elizabeth are brother and sister. They and Dwight were physicians duly licensed to practice medicine in the State of Ohio, as were Robert's and Elizabeth's father, Emory L. Dial, and their brother, Donald E. Dial (hereinafter referred to as Donald).

In 1925, Emory L. Dial built a medical clinic on Lorain Avenue in Cleveland to house the medical activities of his family. In 1928, he secured a $100,000 loan on the property from the Prudential Insurance Company of America (hereinafter referred to as Prudential), secured by a first mortgage. Payments of principal on such loan were to be deferred until April 1931 and thereafter were to be paid at the rate of $4,000 per year until April 1938, when the entire unpaid balance was to become due.

Emory L. Dial died, and in November 1935, Robert, Dwight, and Donald incorporated The Lorain Avenue Clinic (hereinafter referred to as the Clinic) as a nonprofit Ohio corporation. During the years in issue, Elizabeth was a trustee of the corporation in place of Donald. On January 16, 1936, Emory L. Dial's widow, Clara P. Dial, conveyed the building on Lorain Avenue to the Clinic. At that time, the principal balance due on the Prudential mortgage was $94,462. When the balance of the whole mortgage loan came due on April 14, 1938, there was an outstanding balance due of $88,400. Prudential agreed to renew the loan with the provision that it be repaid over a period of

200 months by monthly payments of $442 each, beginning May 1, 1938, with interest at 5½ per cent. In 1944, the Clinic paid $16,354 more than was actually due in that year on the principal amount of the loan. By November 1, 1945, the loan had been paid in full.

When the Clinic was organized it was agreed that Robert and Dwight would receive a fixed salary for their professional medical services. In addition, Dwight, who was also a lawyer, acted as the chief administrator of the Clinic's business from the time of its organization to and throughout all of the years in issue. Emory L. Dial had experienced great financial difficulty in operating the medical center, and the Clinic, after its organization, continued to be in financial distress. Consequently, Robert and Dwight advanced sums to it and paid expenses for it from their personal funds. They were unable to draw the full amounts credited to their salary accounts. Both the advances and unpaid salaries were credited to the same account. In 1936, the Clinic issued its notes to Robert and Dwight in the respective amounts of $22,504.93 and $22,820.02—the then outstanding balances in their accounts. From 1936 to 1938, payments of $8,504.93 and $5,820.02 were made to Robert and Dwight, respectively, on the delinquent accounts. In 1938, new notes were issued to Robert in the amount of $14,000 and to Dwight in the amount of $17,000, which represented the then delinquent amounts of their accounts.

Commencing in 1942 the Clinic's financial condition improved; and during the ensuing 4 years, it paid off the outstanding balance of the Prudential mortgage. It did not have sufficient funds to pay the amounts owing to Robert and Dwight for back salary and other indebtedness.

On January 17, 1945, the three trustees of the Clinic, Robert, Dwight, and Elizabeth, agreed that the amounts owed to Robert and Dwight had become so large that some regularly scheduled method of repayment should be undertaken. At a members' and trustees' meeting on that day they adopted the following resolution, suggested by Dwight as a means of refinancing the indebtedness then carried by the Clinic as notes due its members and as open drawing accounts of such members:

WHEREAS, the corporation desires to obtain funds for its corporate purposes; and

WHEREAS, under its charter and the laws of the State of Ohio, it has authority to borrow money and to issue its negotiable obligations therefore [sic] and to secure the same by mortgage upon its premises and property;

THEREFORE BE IT RESOLVED:

First. That the corporation, in order to obtain such funds, do sign, seal, and dispose of by way of pledge or otherwise, its mortgage bonds in the aggregate principal sum of one hundred twenty thousand dollars ($120,000), being represented by one hundred twenty bonds each in the amount of one thousand dollars ($1,000) dated February 1, 1945 and bearing interest at the rate of seven per

cent (7%) per annum computed quarterly and each payable eighteen dollars and seventy-five cents ($18.75) on the first day of February, May, August and November in each year, and the balance, if any, on the first day of February, 1969, all payments to be credited first to the payment of interest and any balance to be credited to principal, both principal and interest being payable at the office of the corporation. Such bonds shall reserve the right to pay the entire balance owing at any time prior to maturity on payment of the principal amount then owing, the accrued interest and a bonus of five per cent (5%) on the principal amount still owing.

* * * * * * *

RESOLVED FURTHER, That the treasurer of the corporation is hereby authorized to sell the bonds therein referred to at a price of not less than the principal and accrued interest, in whole or in part at any time to such purchasers as seem to him suitable, the unsold bonds, if any, to be held in the corporation treasury and to be sold at the option of the treasurer when and if he sees fit.

On February 1, the Clinic issued such notes or bonds to Robert and Dwight in the respective amounts of their outstanding drawing accounts—$40,000 and $51,000. By November 1, 1945, additional bonds in the amounts of $15,000 were issued to Robert and $14,000 to Dwight, which amounts were equivalent to additional credits to their accounts which the Clinic was unable to pay. Of the total indebtedness, secured by the issuance of notes or bonds to Robert and Dwight in 1945, $4,449.18 and $15,793.76, respectively, consisted of so-called non-income items or amounts which they had paid to or on behalf of the Clinic.

The Clinic had a net deficit in its surplus account of $1,989.72 on December 31, 1944, and of $174.22 on December 31, 1945.

The respondent determined that the notes or bonds in the amount of $50,550.82 received by Robert and in the amount of $49,362.49 received by Dwight in 1945 constituted income to them in that year. The notes or bonds issued to Robert and Dwight in 1945 were not received by them in payment of the Clinic's indebtedness to them.

In the alternative, the respondent determined that the amount of $13,129.05 credited to Dwight's salary account in 1944 was taxable income constructively received by him in that year. The amount credited to Dwight's salary account in 1944 was not subject to his withdrawal or available to him.

In 1947 the Clinic made payments on the indebtedness owed by it to Robert in the amount of $317.96, and to Dwight in the amount of $375.75. The respondent further determined, in the alternative, that Robert received taxable income in 1947 in the amount of such principal payments on the bonds made to him in that year. The amount of $25.72 of such principal payment represented the recovery of sums which Robert had advanced to or for the Clinic and was not taxable to him.

Respondent also determined that in 1946 Dwight and Elizabeth received $75.75 of additional interest income on the bonds which they

did not report on their return for that year. Dwight and Elizabeth reported all interest income received by them in 1946 on their return for that year.

In 1935 the Clinic had purchased a 2-story brick building for $26,322. It rented the property and in 1946 was receiving net rental income at the rate of $1,765 per year. On its balance sheet for the year ended December 31, 1945, it listed the depreciated value of the property, built in 1925, at $21,817.37. In April 1946, it sold the property to Elizabeth and Mary for $22,000. Respondent determined that such property had a fair market value of $26,000, and that petitioners received income in the amount of $4,000 from the sale to Elizabeth and Mary of the realty for less than such fair market value. The fair market value of the property on the date of the sale was not in excess of $22,000.

OPINION.

### Issue 1.

The principal issue raised in these proceedings—whether the receipt of notes or bonds by Robert and Dwight in 1945 constituted income to them in that year—is essentially a question of form versus substance. The respondent predicated his determination of deficiencies on the well established rule that the receipt of notes by a cash basis taxpayer, in payment for services, constitutes income in the year of receipt to the extent of their fair market value. Regs. 111, sec. 29.22 (a)–4.[2] In support of his determination, the respondent argues that the bonds were issued to Robert and Dwight in payment of the Clinic's indebtedness to them for services rendered since 1935, and for advances by them to or on behalf of the Clinic. He further argues that the fair market value of the bonds or notes was includible in their gross income for the taxable year 1945 to the extent that the bonds were sold to them in consideration of the cancellation of the indebtedness owed by the Clinic for their past services. He points out that the resolution authorizing the issuance of the bonds was to the effect that the Clinic needed to refinance the debt owed to Robert and Dwight and that such notes or bonds were sold to them in payment thereof.

---

[2] Regulations 111.
SEC. 29.22 (a)–4. COMPENSATION PAID IN NOTES.—Notes or other evidences of indebtedness received in payment for services constitute income to the amount of their fair market value. A taxpayer receiving as compensation a note regarded as good for its face value at maturity, but not bearing interest, shall treat as income as of the time of receipt the fair discounted value of the note at such time. Thus, if it appears that such a note is or could be discounted on a 6 percent basis, the recipient shall include such note in his gross income to the amount of its face value less discount computed at the prevailing rate for such transactions. If the payments due on a note so accounted for are met as they become due, there should be included as income in respect of each such payment so much thereof as represents recovery for the discount originally deducted.

The resolution adopted by the trustees on January 17, 1945, as quoted in our Findings of Fact, recites the corporation's authority to borrow money and to issue negotiable obligations therefor. It also provided that the treasurer might sell the bonds at a price of not less than the principal and accrued interest. The wording of that resolution, standing alone, lends support to the respondent's determination. But, the whole record here before us demonstrates beyond question that the essential fact necessary to support his determination is absent, namely, that the negotiable instruments were received *in payment* of the prior debt. *Segrist* v. *Crabtree*, 131 U. S. 287 (1889); *Joe W. Scales*, 18 T. C. 1263 (1952), reversed on other grounds 211 F. 2d 133 (C. A. 6, 1954); *Mellinger* v. *United States*, 86 Ct. Cl. 272, 21 F. Supp. 964 (1938); *Schlemmer* v. *United States*, 94 F. 2d 77 (C. A. 2, 1938); *Great Southern Life Insurance Co.*, 36 B. T. A. 828 (1937); and *San Jacinto Life Insurance Co.*, 34 B. T. A. 186 (1936).

We are convinced that the only intent which prompted the issuance of the notes to Robert and Dwight in 1945 was that a plan be adopted providing for a funding of the debts owed to them. The notes were never meant to be anything more than additional security for the principal debts, for nobody intended them to be payment thereof. We are satisfied that this is true even though Robert and Dwight were two of the Clinic's trustees, *Schlemmer* v. *United States*, *supra*, and even though the notes or bonds received by them were secured obligations. *Mellinger* v. *United States*, *supra*.

Since we conclude that such notes or bonds were not received by Robert and Dwight in payment of the principal debts owed to them by the Clinic, such transaction cannot result in taxable income to them in 1945.

### Issue 2.

The respondent determined, in the alternative, that Dwight constructively received income in 1944 to the extent of $13,129.05, credited to his salary account but not paid in that year. That determination is based on the also well established rule that income credited to the account of, or set apart for, the taxpayer, subject to his unfettered withdrawal at any time, constitutes income to him in the year when so credited or set apart, although not in fact reduced to possession. Regs. 111, sec. 29.42–2.[3] We observed many years ago in *John A.*

---

[3] Regulations 111.

SEC. 29.42–2. INCOME NOT REDUCED TO POSSESSION.—Income which is credited to the account of or set apart for a taxpayer and which may be drawn upon by him at any time is subject to tax for the year during which so credited or set apart, although not then actually reduced to possession. To constitute receipt in such a case the income must be credited or set apart to the taxpayer without any substantial limitation or restriction as to the time or manner of payment or condition upon which payment is to be made, and must be made available to him so that it may be drawn at any time, and its receipt brought within his own control and disposition. A book entry, if made, should indicate an absolute transfer from one account to another. If a corporation contingently credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corporation does not constitute receipt.

*Brander*, 3 B. T. A. 231 (1925), a case in which we upheld the Commissioner's application of the doctrine of constructive receipt, that that doctrine was not to be lightly applied but was to be invoked only in situations where it was clearly justifiable. We said, p. 235:

When taxable income is consistently computed by a citizen on the basis of actual receipts, a method which the law expressly gives him the right to use, he is not to be defeated in his *bona fide* selection of this method by "construing" that to be received of which in truth he has not had the use and enjoyment. Constructive receipt is an artificial concept which must be sparingly applied, lest it become a means for taxing something other than income and thus violating the Constitution itself. * * *

It is apparent to us, from the record here, that the amounts credited to both Dwight's and Robert's salary accounts were not available to them during any of the years in issue. The balance sheet of the Clinic on both December 31, 1944 and 1945, showed a net deficit in its surplus account. The respondent has argued that funds were actually available to pay the amount credited to Dwight's account in 1944, and in proof of that assertion cites the payments made on the Prudential mortgage of $16,354 more than was currently due on such mortgage in that year. Admittedly, the fact that Dwight, Robert, and Elizabeth were the trustees of the Clinic, and had complete control over the disposition of its money, places Dwight in the suspect position that he could have paid himself at least the amount due him for services in 1944, if he had wished. We are satisfied, however, from the whole record here, that the three trustees acted in good faith and on what they believed was sound business judgment in paying off the entire balance of the Prudential mortgage during the 4 years from 1942 to 1945, inclusive, when the Clinic's financial condition was, at that time, somewhat improved. It may well be that in every year in which amounts were credited to Robert and Dwight, but not paid to them, they, as the trustees and controllers of the Clinic's money, could have paid themselves first and other obligations of the Clinic later. They did not do that but acted in what they felt was the best interest of the Clinic, and adversely to their own personal interests, by not withdrawing the sums to which they were entitled. We cannot uphold respondent's determination that the amount credited to Dwight's account in 1944 constituted income constructively received by him in that year. *Hyland* v. *Commissioner*, 175 F. 2d 422 (C. A. 2, 1949); *John Harvey Kellogg*, 2 T. C. 1126 (1943); *Adolph Zukor*, 33 B. T. A. 324 (1935); *Old Colony Trust Co. et al., Administrators*, 22 B. T. A. 1062 (1931); *Estate of L. Bach et al.*, 9 B. T. A. 1404 (1928); *Nicholas J. Maisel, Jr.*, 2 B. T. A. 66 (1925), *A. L. Englander*, 1 B. T. A. 760 (1925). *Cf. Joseph Frank*, 22 T. C. 945 (1954), on appeal C. A. 6, Nov. 4, 1954; and *James J. Cooney*, 18 T. C. 883 (1952).

The petitioners have argued on brief as if the respondent determined that Dwight and Robert constructively received the amounts credited to their respective salary accounts in 1945. The respondent determined deficiencies against both petitioners for that year, based on the receipt of additional income. We understand that the respondent's position as to those deficiencies rests entirely on the receipt of the notes or bonds as additional income. He does not argue on brief that such credits were constructively received in 1945, and had he done so, we would not have agreed with him for the reasons set forth above, with respect to Dwight's alleged constructive receipt of income in 1944.

## Issue 3.

Respondent determined, again in the alternative, that $317.96 received by Robert in 1947 as payment on the principal amount of indebtedness, secured by the notes or bonds, was taxable income. Petitioners contend that such sum represented a repayment of the so-called non-income items or expenses of the Clinic which Robert had paid in its behalf.

We think the position taken by both parties with respect to the payment was wrong. The nature of the payment here is not essentially different from a lump-sum award received in payment of different claims which give rise to ordinary income, long-term gain, or no income at all. The total amount of the award is apportioned, in such case, between the various claims on which the taxpayer has recovered. See *Telefilm, Inc.*, 21 T. C. 688 (1954), on appeal C. A. 9, July 6, 1954. We, therefore, hold that of the $317.96 amount which Robert received in 1947, $25.72 [4] represented a recovery of sums advanced to or for the Clinic and is not taxable, and that the remainder is taxable as ordinary income.

Robert claimed a refund for the year 1947 because of a mathematical error in his return, which claim was denied by the respondent because of the addition of such $317.96 to his income in that year. Pursuant to our holding on this issue, the amount of overpayment of tax for 1947, if any, will be determined in the computation under Rule 50.

The petitioners argue on brief that a similar principal payment received by Dwight in 1947 was not taxable since it was the recovery on the non-income-item portion of the total debt owed to him. The respondent did not determine a deficiency in Dwight's income tax for 1947, and we have no jurisdiction over the overpayment which he claims for that year. *F. A. Gillespie Trust*, 21 T. C. 739 (1954).

---

[4] $\frac{4,449.18}{55,000.00} \times \$317.96 = \$25.72$.

*Issue 4.*

The respondent determined that Dwight and Elizabeth received an additional $75.75 of interest income which they did not report on their return for 1946. We found as a fact that they reported all interest received by them in that year. Dwight testified at the hearing that the respondent's determination was based on a bookkeeping error in the Clinic's books, subsequently corrected, but which correction the examining revenue agent had not noticed in his examination of the Clinic's books. We are satisfied that Dwight's testimony with respect to this item was accurate and that the respondent, therefore, erred in determining that Dwight and Elizabeth received additional unreported interest income in 1946.

*Issue 5.*

In the deficiency notices for the year 1946, respondent added $2,000 to the Dial's income and $2,000 to the Spreng's, which he determined resulted from the purchase by Mary and Elizabeth of a piece of rental property from the Clinic for its book value. The respondent determined that the property had a fair market value of $26,000, and that petitioners had constructively received income to the extent of the difference in the purchase price and such market value. On brief, however, the respondent contends that it was actually Robert and Dwight who, each, constructively received additional income of $2,000. We are unable to determine from the respondent's argument the theory upon which he proceeded to determine that the alleged difference in purchase price and market value constituted income to anybody. But, without resorting to idle speculation as to what that theory is, we think certain evidence in the record casts serious doubt on the correctness of his determination that the fair market value of the property sold to Mary and Elizabeth was, in fact, $26,000. At the trial we did not permit Dwight to testify as to what he considered the fair market value of the property to be for the obvious reason that he was not competent to testify as an appraiser. He was, nonetheless, from all that appears, a competent business administrator in addition to being one of the member physicians of the Clinic. He testified as to the proximity of a deteriorating neighborhood to the property, as to its general upkeep and state of repair, and that the net rental income was $1,765 per year. These were items about which he was competent to testify. He suggested that the net earnings, capitalized at 9 per cent, would indicate a value of $19,600 for the property. The expert appraiser who testified with respect to the value of the nearby building, which the Clinic itself occupied, also used a 9 per cent capitalization rate and considered capitalized earnings the most accurate method of arriving at the fair market value of

a given piece of rental income property. In the face of this evidence, we think it was incumbent on the respondent to come forward with some additional evidence to buttress his bare determination of the fair market value. He did not do that, and on the state of the record as it stands, we hold, in accordance with our finding of fact, that the fair market value of the property was not in excess of $22,000.

*Decisions will be entered under Rule 50.*

