J. ROGER DEWITT AND MARY MILDRED DEWITT, PETITIONERS, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56109.    Filed April 9, 1958.

*Joseph A. Hoskins, Esq.*, and *Charles P. Schleicher, Esq.*, for the petitioners.

*Lyman G. Friedman, Esq.*, for the respondent.

FISHER, *Judge:* Respondent, by notice dated November 3, 1954, determined a deficiency of $33,519.94 in petitioners' income taxes for the fiscal year ended August 31, 1949.  The basic question for our decision is whether the sale by petitioners of all the stock in Dew Corporation for an agreed consideration of $221,012.83 was a bona fide sale of stock or whether it was, in effect, a sale by petitioners of new and used cars to customers in the ordinary course of petitioners' trade or business.

### FINDINGS OF FACT.

Some of the facts have been stipulated, and are incorporated herein by this reference.

J. Roger DeWitt and Mary Mildred DeWitt, petitioners herein, are husband and wife.  During the year in issue, the fiscal year ended August 31, 1949, they resided in Independence, Missouri, and maintained their place of business in Kansas City, Missouri.

Petitioners filed their timely joint Federal income tax return with the collector of internal revenue for the sixth district of Missouri, and reported thereon, *inter alia*, a long-term capital gain of $169,147.11 from the sale of their stock in Dew Corporation to W. O. Bankston of Dallas, Texas.

Petitioners owned all of the issued and outstanding shares of Dew Corporation for many years.  The corporation was organized in 1930 under the name of the DeWitt Chevrolet Company for the following, among other, purposes:

To own * * * and trade in, * * * notes, bills of exchange and all forms of negotiable and non-negotiable evidences of debt; * * * to buy, sell, trade, ex-

1

change, distribute, lease, hire, repair and rebuild automobiles, trucks, motor-cycles and all forms of automotive vehicles; to manufacture, buy, sell, rent, store, repair and care for parts, * * * and all other personal property of every kind and description used in and about the carrying on of motor car sales, repair and storage business; to make loans secured by motor vehicles, their parts, appurtenances, supplies and to deal in such securities; * * *

The corporation was authorized to issue 750 shares of stock at a par value of $100 each. Of the authorized amount, 500 shares were issued for cash, 497 to petitioner J. Roger DeWitt, 1 to his wife, petitioner Mary Mildred DeWitt, and 1 share each to two others. Subsequent to the date of incorporation, J. Roger DeWitt acquired the 2 shares last mentioned above. Prior to the year in issue, he transferred legal title in 1 share to William F. Buntin in order to qualify him as a director in the corporation. Buntin held the share as nominee for DeWitt.

The Dew Corporation operated as the DeWitt Chevrolet Company, a corporate franchise dealer appointed by the Chevrolet Division of General Motors Corporation, until April 30, 1943, selling new and used cars, and writing automobile paper. On that date the board of directors authorized the sale of the Chevrolet franchise to J. Roger DeWitt and Mary Mildred DeWitt, d. b. a. DeWitt Chevrolet Company, a partnership. The sale was prompted by the drastic reduction in the manufacture of automobiles during the war. The corporation located some new cars of makes other than Chevrolet which it could purchase and market easily. While it was a Chevrolet franchise dealer, however, it was prohibited from so doing. By selling the franchise, the corporation could market other cars and loan money on them.

Upon sale of the franchise, the name of the corporation was duly changed from DeWitt Chevrolet Company to the Dew Corporation. The name was changed in order to make the name "DeWitt Chevrolet Company" available to the partnership taking over the franchise. After sale of the franchise, the Dew Corporation made the following sales of new and used cars for the period indicated:

| Year | New | Used |
|---|---|---|
| 1943 | ------ | [2] 14 |
| 1944 | [1] 11 | 77 |
| 1945 | [1] 1 | 39 |

[1] No Chevrolets.
[2] All sold before the franchise was transferred to the partnership.

From 1946 until the date the partnership transferred its inventory of new and used cars to Dew Corporation, as will hereinafter be related, the corporation was more or less out of the automobile sales business. The reason for the inactivity in this field was that the corporation had no franchise, and, because of the demand for cars after

World War II, new cars were not available except to franchise dealers. Desirable used cars were not available for marketing.

The corporation, however, was active in other fields at all times following the date of transfer of the Chevrolet franchise to the partnership. The corporation earned taxable income in the following amounts for the years indicated:

| Year | Net income before taxes |
|---|---|
| 1944 | $14, 458. 71 |
| 1945 | 2, 487. 62 |
| 1946 | 5, 028. 32 |
| 1947 | 10, 324. 82 |
| 1948 to October 15 | 16, 215. 31 |

After sale of the franchise to the partnership, that organization acted as a franchise dealer in Chevrolet automobiles and parts. During the war, it did principally a parts and servicing business. On November 1, 1947, the partnership and the Chevrolet Division of General Motors Corporation executed the then current nonexclusive franchise agreement known as Direct Dealer Selling Agreement. The agreement was to run for 1 year, and was to expire automatically on October 31, 1948, unless sooner terminated.

Under the agreement the dealer could terminate on 1 month's written notice. Seller could terminate for cause, i. e., if dealer did not develop the territory assigned to him to the satisfaction of seller, or did not conduct his business in accordance with the requirements of the contract or to the satisfaction of seller. Upon termination, dealer could no longer use the word Chevrolet in its business.

In the event of termination, clause 26 A of the agreement provided as follows:

A. Seller will purchase from Dealer and Dealer will sell to Seller:

(1) All new and unused Chevrolet motor vehicles and chassis of the current model on hand in Dealer's place of business or in Dealer's possession at Dealer's net cost, including transportation charges paid to Seller thereon.

Seller agreed to purchase and dealer to sell (1) parts, at dealer's net cost, exclusive of transportation charges; (2) accessories purchased within 6 months of termination, at dealer's net cost, exclusive of transportation; (3) certain commercial bodies and cabs at dealer's net prices according to current price lists; and (4) signs and certain advertising paraphernalia. In clause 26 B, provision was made for the resale of certain tools if the dealer desired to sell them.

Clause 26 of the agreement continues:

C. Dealer shall, on or before the date of termination, furnish Seller with a list of motor vehicles, chassis, parts, accessories, signs, tools and shop equipment aforesaid.

D. Upon demand and tender by Seller of the purchase price determined as aforesaid, Dealer will deliver such goods to Seller forthwith in accordance with Seller's instructions.

E. Dealer shall execute and deliver to Seller instruments satisfactory to Seller, conveying title to the aforesaid property. * * *

The 1949 models of Chevrolet automobiles came out in the middle of December 1948.

In January 1946, DeWitt was in a serious automobile accident, in which he suffered severe injuries, including three concussions and a large number of broken bones. After recovering from his injuries, he became much less active in the business. His lack of attention to business was objected to by Chevrolet as were certain practices of his subordinates of which DeWitt had no knowledge at the time.

On July 16, 1948, G. H. Good, zone manager for the Chevrolet Division wrote DeWitt Chevrolet Company as follows:

Your attention is directed to the fact that your current Chevrolet Selling Agreement expires automatically by its terms on October 31, 1948. Please be advised that Chevrolet Motor Division, General Motors Corporation will not offer you a new Selling Agreement and your status as an authorized Chevrolet Dealer will, therefore, terminate on that date.

The partnership believed that Chevrolet would not renew its franchise. New cars were in great demand in 1948 and the outlook for continued demand was very favorable. The partnership appealed the ruling of the zone manager to T. H. Keating, general sales manager of the Chevrolet Division in Kansas City, who, on August 27, 1948, sustained the action of the zone manager. Thereafter, under date of September 4, 1948, a final appeal was taken to the Dealer Relations Board of General Motors. (See *infra* for subsequent termination of agreement with Chevrolet.) At the same time, the partnership began accumulating cars on hand in a garage in downtown Kansas City with the thought that it would sell the cars to the Dew Corporation in order to prevent Chevrolet from repurchasing them, and in order to use the accumulated cars as a nucleus for the corporation's (and, thereby, petitioners') future activity in the automobile field. The partnership virtually quit selling new cars to customers after July 16, 1948.

When it was found out that the partnership's agreement with Chevrolet would not be renewed, petitioners received many offers for the cars on hand but refused to sell them. On September 10, 1948, petitioners entered into a contract of sale with T. W. Hoehn to sell the parts, accessories, materials, and supplies of the partnership, effective November 1, 1948. The contract was conditioned, *inter alia*, upon Hoehn's ability to get a franchise from Chevrolet. Hoehn failed to obtain the franchise and the deal fell through. During the

course of negotiations Hoehn offered to purchase the cars on hand. His offer was refused.

On October 3, 1948, petitioners entered into an agreement with William J. Goddard to sell the parts, equipment, supplies, furniture, and lease. Goddard had already acquired the franchise from Chevrolet. Goddard offered to purchase the cars from the partnership but was refused. His offer to purchase a truck used in the business was also refused. The partnership agreed to make the premises available to Goddard on October 8, 1948, and voluntarily terminated its agreement with Chevrolet by letter dated October 5, 1948.

In refusing to sell the cars to Hoehn, Goddard, and others, petitioners had in mind to transfer the cars to the Dew Corporation, and to have that company reenter the automobile sales or rental business. Prior to November 1, petitioners had not decided whether to enter the sales field—in which case the new cars, when sold, would be replaced by used cars taken as trade-ins, thereby continuing petitioners in business—or whether to enter the automobile rental business. In either activity a pickup truck would be of use to the business. At no time prior to November 1, 1948, did petitioners form an intention of discontinuing their activities in the automobile field.

At the meeting of the stockholders of Dew Corporation on August 17, 1948, 1 month after the partnership received the original notice that its franchise would not be renewed, DeWitt announced that the partnership was surrendering its franchise at the end of the contract year, and that the partnership was willing to sell the cars it had on hand to the Dew Corporation at actual book cost in order to prevent General Motors from reacquiring these valuable assets. DeWitt indicated that the partnership was willing to take notes in payment for the cars until the corporation could dispose of sufficient assets to pay for them.

On September 2, 1948, after the partnership's appeal to Keating had failed, but before its appeal to the Dealer Relations Board had been acted upon, DeWitt again announced the partnership's willingness to sell the cars to Dew Corporation at book value, the cars on hand to be sold as of October 1, 1948, and automobiles received after that date to be sold as received. DeWitt warned that the sale should not be delayed if the corporation was to be assured of the cars.

At the meeting, a report was also given on the possible disposition of the corporation's real estate and securities. DeWitt offered to purchase the real estate at book value or appraised value, whichever was higher.

At a meeting of October 5, 1948, the following was reported:

1. An appraisal of the real estate resulted in a valuation which was

less than that carried on the books. The real estate was therefore sold to DeWitt for $88,422.71, its book value.

2. $76,553.67 in notes owing by the corporation have been paid off. The remaining indebtedness of $25,000 was expected to be paid off in a few days.

3. DeWitt Chevrolet Company, on October 1, sold and delivered to the corporation 82 new automobiles for a consideration of $100,114.33. The partnership agreed to carry the purchases on open account pending redemption of securities owned by the corporation, and pending liquidation of miscellaneous liabilities. The liquidation of miscellaneous liabilities was desirable in order to allow the corporation to reenter the automobile field.

On October 5, 1948, DeWitt notified Chevrolet that he was terminating his agreement with them, and requested a waiver of the 30-day notice of termination. On the same day he wrote Chevrolet stating that he had sold the physical assets of the business to Goddard, and that he was voluntarily terminating his selling agreement. DeWitt also stated that he had no claims arising out of the provisions of the agreement relating to the repurchase of new or used cars, parts, equipment, signs, or other personal property. The next day DeWitt notified the Dealer Relations Board that he was withdrawing his appeal. These letters were occasioned by the sale of the business to Goddard.

Between October 1 and October 14, DeWitt Chevrolet Company received 28 cars from Chevrolet. These deliveries made up for shortages in shipments received during prior months of the contract year. Chevrolet agreed to give the partnership all the cars to which it was entitled when the partnership sold out to Goddard. The cars were immediately delivered to Dew, and were carried as an account receivable by the partnership. No deliveries of cars were made by Chevrolet to DeWitt Chevrolet Company after October 14, and no deliveries were made by the partnership to Dew Corporation after that date. In all, 110 new cars were sold by the partnership to Dew, for a total consideration of $133,313.38, and 5 used cars were sold for a total consideration of $5,810.98. The total purchase price was carried on open account until the day on which the stock was sold and transferred to Bankston.

Sometime prior to November 1, 1948, a representative of W. O. Bankston, an automobile dealer in Dallas, Texas, was in Kansas City on business for Bankston. The representative knew J. Roger DeWitt and mentioned to him that Bankston might want to negotiate for the cars. On or about November 1, Bankston telephoned DeWitt from Dallas, and offered to purchase the cars on hand from DeWitt. DeWitt explained that the cars were owned by a corporation, and that he was unwilling for the corporation to sell the cars. During the

course of the conversation, DeWitt stated that he did not know whether or not he wanted to sell the stock of the corporation. After the conversation, DeWitt was still hesitant about selling out, which would force him out of the automobile business after more than 20 years in that field, but finally agreed after some urging by his wife.

Arrangements were thereupon made with Bankston for the sale of the stock. The agreement stated that DeWitt owned 500 shares of Dew, which he was willing to sell and Bankston was willing to buy. Bankston agreed to purchase the shares for $221,012.83, plus the assumption of $3,800 in Federal and State taxes estimated to be owing by Dew up to the date of sale, and the assumption of an account payable in the amount of $10,187.12, in favor of DeWitt. This latter amount represented the balance of the amount owed for new and used cars purchased by Dew from the partnership. The remainder of the purchase price for the new cars, $128,937.19, had been paid by Dew to DeWitt earlier in the day. Bankston had requested that the corporation be stripped of all assets and liabilities other than the cars, and his wishes were carried out.

The sale of the cars by the partnership to Dew was not connected in any way with the sale of stock by petitioners to Bankston. Petitioners did not use the corporation merely as a conduit through which to pass title to the cars to Bankston.

### OPINION.

In *Commissioner* v. *Court Holding Co.*, 324 U. S. 331, 334, the Supreme Court stated that "[a] sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title." The question here presented is whether the sale of Dew Corporation stock by petitioners was a bona fide sale of such stock, or a disguised sale of automobiles by the partnership to Bankston in the ordinary course of business. The issue is essentially one of fact. See *S. Nicholas Jacobs*, 21 T. C. 165, affd. 224 F. 2d 412 (C. A. 9, 1955). As our findings indicate, we hold for petitioners.

To uphold his determination that the sale of the stock to Bankston was not what it seemed, respondent argues that the sale was merely a sale by the partnership, or by the DeWitts personally, of inventory held out for sale to customers in the ordinary course of their trade or business, and a liquidation of other assets of Dew Corporation.

In our view, the transfer of the cars from the partnership to Dew was bona fide, and had no connection with the subsequent sale of the stock to Bankston. After receiving notice on July 16 that his franchise would not be renewed, DeWitt immediately began accumulating automobiles and removing them from the partnership towards the

day when his ready source of supply would be cut off. The fact that he appealed the decision of the zone manager does not change the nature of his action from prudent caution to furtive scheming. The agreement between DeWitt and Chevrolet allowed Chevrolet to buy back the automobiles on hand at dealer's cost, and DeWitt had no indication that Chevrolet would not exercise its right. He was not required to trust to luck that Chevrolet would not do so. Respondent argues that Chevrolet would not have shipped cars to the partnership after October 1, had it not intended to allow the partnership to keep them. Chevrolet was, however, obligated by its agreement to sell cars to the partnership. Furthermore, the deliveries after October 1 represented shortages in prior shipments, and although it appears that Chevrolet agreed to ship the cars if the partnership voluntarily discontinued its franchise on October 8 rather than on November 1, this fact does not take petitioners' action out of the realm of caution. Furthermore, most of the cars were transferred to Dew prior to the sale to Goddard and the partnership's voluntary termination of its franchise, and the remaining cars were transferred pursuant to petitioners' original plan. Whatever reason Chevrolet had for shipping cars after October 1, we see no reason why DeWitt should have taken the chance of inferring from their shipment that Chevrolet would not exercise its rights. This view is all the more reasonable when it is considered that the demand for cars was very great and their value to petitioners was not only in their monetary worth but in the possibility of using them as a nucleus for future activity in the automobile business.

The fact that the cars were sold to Dew Corporation at book value is not significant under the circumstances here presented. The main purpose of the transfer was to remove the cars from the effect of the obligations and conditions of the selling agreement with Chevrolet, which had the right to repurchase them at book value. We note also that the agreement with Chevrolet required the partnership to give up the use of the name Chevrolet upon termination of the agreement. Whether or not the partnership could have continued operations, after a fashion, without the franchise does not establish the proposition, urged by respondent, that there was no reason to transfer the cars to Dew. The threat arising out of the fact that Chevrolet could have taken the cars back is in itself a sufficient reason for the transfer of the cars to the corporation, a readily available entity to take them over. DeWitt testified that he did not want to run his business as a partnership, and respondent points to no reason why he should have done so. Under the circumstances, we think it quite reasonable and understandable that petitioners transferred the cars to Dew rather than retain them in a partnership.

In this connection, it may be well to note that Dew Corporation was organized in 1930 and immediately after incorporation entered actively into business. The corporation continued in business at least until the date its stock was transferred to Bankston, and perhaps thereafter (there is nothing in the record to show that Dew Corporation was ever liquidated). While its Chevrolet franchise was transferred to the partnership in 1943, the purpose of the transfer was to allow Dew to continue to operate at a time when Chevrolet had discontinued manufacturing automobiles. The transfer of the franchise, in other words, was to enable Dew to continue to function rather than to disable it from functioning. DeWitt acted with complete consistency when he had the partnership transfer the cars to Dew upon losing the franchise.

Having determined that the cars were transferred to Dew Corporation to keep Chevrolet from repurchasing them at dealer's net cost, we next note that Bankston and DeWitt were not in serious contact until November 1, and that the last cars were delivered to Dew Corporation on October 14. DeWitt testified that he at no time had any intention to sell the cars. He received and refused to accept a large number of offers for all or part of the cars, including offers from the two parties who at one time or another contemplated taking over his franchise. DeWitt had been in the automobile business for over 20 years and did not contemplate terminating his activities in that industry. Either the cars would form the nucleus of a retail sales business, or they would provide the inventory for a rental business. DeWitt's testimony was corroborated by his wife, and by a credible witness, formerly the third member of the board of directors of Dew Corporation, who at the time of the transaction in question had been sales manager of the partnership, and who, at the time of trial, was in business in Illinois and in no way related to the DeWitts. We believe the testimony of these witnesses and point out that there is no evidence to the contrary.

In view of the foregoing, we need not speculate as to why petitioners decided to sell their stock to Bankston, thereby removing themselves from the automobile business. There is evidence that DeWitt's wife urged him to do so for reasons of health. It may be, as is suggested on brief, that petitioners merely changed their minds when approached by Bankston. In any event, we have concluded that petitioners have met their burden of proving that they had no intention of ridding themselves of control over the cars, either by selling the cars or by selling their stock, at the time they transferred the cars to Dew Corporation.

It is clear, then, in the light of the evidence presented, that petitioners were not using the corporation as a conduit through which

they could obtain capital gains treatment on ordinary income items. Petitioners are, therefore, entitled to capital gains treatment on the sale of their stock.

Because of other adjustments conceded by one or the other of the parties, and thus not here in issue,

*Decision will be entered under Rule 50.*