VIRGINIA W. STETTINIUS DUDLEY, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 62570, 62571, 63143–63148, 63529–63537, 63713–63715, 63915, 63916.　　　　　　　　　　Filed May 29, 1959.

---

[1] Proceedings of the following petitioners are consolidated herewith : Julius C. Holmes and Henrietta A. Holmes, Docket No. 62571 ;  William E. Dobson and Thelma S. Dobson, Docket No. 63143 ; John P. Maguire, Docket No. 63144 ; E. Stanley Klein and Elizabeth M. Klein, Docket No. 63145 ; Arthur M. Klein and Ethelyn L. Klein, Docket No. 63146 ; Tracy D. Pratt and Marilyn K. Pratt, Docket No. 63147 ; Estate of Frederick H. Wandelt and Helen Wandelt, Docket No. 63148 ; F. Willard Bergen and Hazel W. Bergen, Docket No. 63529 ; Harold J. Maass and Isabel Maass, Docket No. 63530 ; John C. Ennis and Theresa M. Ennis, Docket No. 63531 ; Fred Barrett and Anne Barrett, Docket No. 63532 ; Frank A. Dwyer, Docket No. 63533 ; William N. Westerlund and Lyn B. Westerlund, Docket No. 63534 ; John Ellis Knowles and Marion B. Knowles, Docket No. 63535 ; William F. Halsey and Frances G. Halsey, Docket No. 63536 ; Roland T. Reid and Mae V. Reid, Docket No. 63537 ; Frank M. Bynum and Elbee A. Bynum, Docket No. 63713 ; Charles Bosak and Aloyse M. Bosak, Docket No. 63714 ; William J. Hawthorne and Beatrice J. Hawthorne, Docket No. 63715 ; George D. Hawthorne, Docket No. 63915 ; Estate of Frank J. Schmitt and M. Lorraine Schmitt, Docket No. 63916.

*George E. Cleary, Esq.*, for the petitioners.
*Ellyne E. Strickland, Esq.*, for the respondent.

nag

578

580

OPINION.

RAUM, *Judge:* 1. This case presents a variation of the familiar problem of substance versus form. Petitioners contend that the transaction under review was simply a sale of 1,000 shares of National stock at $450 a share which had been acquired at $1 a share, and that the difference represents long-term capital gain. Respondent's determination, on the other hand, proceeds upon the assumption that the substance underlying this apparently simple sale of stock was entirely different, namely, that the purported sale of the National stock was merely the final step in a transaction designed essentially as a sale of the 3 American flag tankers or the right to acquire them by AOTC to United at a profit of $450,000 to AOTC, accompanied by a simultaneous distribution of that profit to stockholders of AOTC (or their nominees), and that such distributions are taxable as ordinary income. Respondent's position treats National merely as a convenient device employed to accomplish the result which was thus planned from the beginning.

We think the evidence supports the latter view. National was created only after United expressed its interest in purchasing the 3 American flag tankers and AOTC realized that its loan agreement with Metropolitan would prevent taking title to the tankers in its own name. Prior to that time the need for a second corporation had not even been suggested. AOTC had *earned* the right to purchase the tankers in question by applying to the Commission in

its own name and filing amendments to its application in order to conform to the Commission's changing policies. As of December 12, 1947, AOTC, through the efforts of its officers and promoters, held allocations for 8 tankers, 3 for American registry and 5 for Panamanian registry; title to all 8 tankers was to be taken in the name of AOTC. United, unsuccessful in its own efforts to obtain a tanker allocation from the Commission, turned to AOTC in the hope of accomplishing indirectly what it had failed to accomplish directly. AOTC, unable to charter the American flag tankers or to finance their acquisition, responded favorably.

The memorandum of January 19, 1948, although not itself a contract, is a clear indication of United's desire to purchase the 3 tankers and of AOTC's desire to sell. The first paragraph of the memorandum establishes AOTC's willingness to consider the "sale" of the tankers to United under certain conditions. The second paragraph outlines the means by which the sale was to be accomplished. AOTC was to form a new corporation "for the specific purpose of taking title to these three ships." United was to bear the entire financial burden of the purchase by supplying funds sufficient to pay not only the statutory sales prices but drydock and insurance expenses as well. After title had been transferred to the new corporation, the shareholders thereof would agree to sell all their stock to United for $450,000, plus $25,000 as reimbursement for certain other expenses. The memorandum leaves little doubt that AOTC contemplated eventual sale of the tankers to United. Formation of a new corporation by AOTC, transfer of the tankers to it, and sale of its stock to United were merely means to that end and part of a single planned transaction. In these circumstances, the $450,000 payment represents in substance a profit to AOTC from the proposed tanker sale. Cf. *Nicholas Jacobs*, 21 T.C. 165, affirmed 224 F. 2d 412 (C.A. 9); *J. Roger DeWitt*, 30 T.C. 1.

We are not persuaded by petitioners' argument that AOTC could not have "sold" the tankers or distributed dividends because its agreement with Metropolitan prevented it from so doing. The agreement may have foreclosed a direct sale and dividend distribution by AOTC but it did not preclude realization of the same result by indirect means. Tax consequences are determined by the substance of a transaction rather than by the means employed to transfer legal title. Cf. *Griffiths* v. *Helvering*, 308 U.S. 355; *Commissioner* v. *Court Holding Co.*, 324 U.S. 331; *United States* v. *Cumberland Public Service Co.*, 338 U.S. 451. As was stated in the *Jacobs* case, *supra* at 169:

Although petitioner went through all of the formal steps of activating a dormant corporation, transferring the property in question thereto in exchange solely for its stock and then "selling" such stock to a corporation dominated and controlled by one, who, it is admitted, was anxious to acquire the land by whatever

means, it seems clear to us that it was of no avail taxwise. All of the separate transfers were but component steps of a single transaction, namely, the sale and transfer of petitioner's Sacramento property to MacBride or to a corporation controlled by him. * * *

Moreover, even if there was no enforceable agreement or binding commitment on the part of petitioner to sell his stock in Subdivision prior to its issuance to him, it is properly to be inferred from the evidence at hand that there did exist an understanding to such effect, albeit implied. * * *

Consequently, we are constrained to disregard the corporate entity of Subdivision, and hold that it served only as a conduit through which petitioner was enabled to effect a sale of property in the ordinary course of his real estate business * * *

In *Kimbell-Diamond Milling Co.*, 14 T.C. 74, affirmed per curiam 187 F. 2d 718 (C.A. 5), certiorari denied 342 U.S. 827, it was found that taxpayer corporation had, in substance, purchased the assets of another corporation even though the transaction took the form of a stock purchase followed by a preconceived liquidation. Similarly in the case at bar, it is our view that AOTC sold the tankers in question even though the sale took the form of the creation of National, transfer of the tanker allocation to it, and sale of National stock to United pursuant to a prearranged plan.

This interpretation of the tanker deal is verified by events occurring subsequent to the memorandum of January 19, 1948, and prior to January 17, 1949, when the last installment on the option price was paid. In informal discussions with the Commission and pursuant to Amendment No. 4 filed on January 22, 1948, AOTC obtained the Commission's consent to take title to the 3 tankers in the name of National, a corporation with "the identical officers, directors, and stockholders" as AOTC. The Commission's consent to the amendment was thus clearly predicated upon the assumption that National would be the alter ego of AOTC, at least in terms of ownership.

The agreement of January 24, 1948, made more obvious what was already apparent, namely, that National was to serve no purpose other than to hold title to the tankers until such time as United was in a position to pay for them. The express terms of the agreement effectively prevented National from engaging in any business activities except those incidental to the contemplated transfer of ownership to United. The appointment of Chung Ching Wei as assistant treasurer of National with power to countersign all checks imposed a virtual hammerlock on National's operations and guaranteed that its affairs would not be conducted to the prejudice of United. That the contract was in the form of a "loan" agreement accompanied by grant of an option is not controlling. The primary function of the agreement was to provide a convenient means for consummating the understanding of the parties as expressed in the previous memorandum, namely, ultimate sale of the tankers in question. We are

not aware of any intervening negotiations between the parties which might lead us to a different conclusion. Nor are we aware of any change in circumstances which might have caused the parties to depart from their intention as originally expressed. As shown by the evidence, United continued to be AOTC's only hope for profitable disposition of the tankers and, as far as we know, there was no abatement of United's desire to acquire tankers to transport oil for the Nationalist Government of China. Until such time as United should exercise or fail to exercise the option, the terms of the "loan" agreement limited National's functions to those of a corporate shell holding title to the tankers and conduit for payments to the Commission. Such being the case, the disregard of the several steps intervening between the original negotiations between AOTC and United for sale of the tankers and consummation of that sale is in accord with established principles. The applicable rule of law was thus stated in *Jackson* v. *Commissioner*, 233 F. 2d 289, 290 (C.A. 2), affirming 24 T.C. 1, as follows:

A corporation may not be disregarded in respect of taxation if, *inter alia*, a bona fide intention in creating it was that the corporation itself should have some real substantial business function, or if it actually engages in business; on the other hand, the corporation may be disregarded, in the absence of such an intention or activity.

In the *Jackson* case the owners of the stock of Empire Corporation, in order to avoid further disputes among themselves with respect to the management of Empire, agreed to transfer one-third of Empire's assets to a new corporation to be controlled and managed by petitioners, owners of one-third of Empire's outstanding stock. To accomplish this goal, Empire transferred one-third of its assets to corporation A in return for all the stock of corporation A. Petitioners transferred their Empire stock to corporation B; corporation B in turn sold the Empire stock to corporation C for $1,000 cash and $469,000 in notes; and corporation C transferred the Empire stock to Empire for the stock of corporation A. The purpose of these intricate maneuvers was to assure that Mrs. Jackson, owner of all the stock of corporation C, would have, as her sole property free from the claims of her husband's creditors, any future increment in the value of the stock of corporation A. The Court of Appeals held that corporation B and corporation C should be disregarded despite the fact that they were employed for reasons other than tax avoidance, namely, to escape Mr. Jackson's creditors. We think the reasons for the creation of National, namely, avoidance of restrictions imposed by AOTC's creditors, are not sufficiently different to warrant a different result. Cf. *National Investors Corp.* v. *Hoey*, 144 F. 2d 466 (C.A. 2), reversing 52 F. Supp. 556 (S.D.N.Y.). Certainly, the fact that corpora-

tions A and B were formed to avoid personal creditors whereas National served to bypass the restrictions of business creditors is not a sound basis for distinction. The significant fact is that in both cases the corporations in question were formed solely to hold title to assets and engaged in no substantial business activities.

The contract to purchase the tankers from the Commission was signed by AOTC 5 days *after* the United-National agreement and again reiterated National's function as titleholder. On the same day United advanced $607,950 to National and National in turn paid that amount to the Commission by way of a downpayment.

National was similarly used for the payment of the balance of the statutory sales prices. Although a substantial part of the subsequent financing was advanced directly to National by independent banks rather than by the Chinese interests backing United, it was United and China Trading, not National, that bore the true financial responsibility for repayment. United and China Trading had arranged and guaranteed all the subsequent financing. National's liability was of no financial consequence since it had never invested any of its own funds in the tankers and its stockholders had never contributed any more than the initial $1,000 of paid-in capital.

In seeking to establish an independent identity for National, petitioners lay much stress on United's financial inability to exercise the option when the option period arrived and the subsequent negotiation of a "new agreement" between National and United. In our view this was not a "new agreement" at all. It was rather an exercise of the option granted on January 24, 1948, with the one modification that payment of the $450,000 be made in installments rather than in a lump sum. The continued depression of the charter market, the comparative expense of operating under American registry, the poor condition of the tankers, and the absence of any other source of financing left no alternative other than to accept United's suggestion. Similarly unfavorable conditions prevailed in January 1948, when United first approached AOTC. At that time AOTC realized that United's proposal was the only convenient and potentially profitable opportunity to dispose of the allocation; in organizing National and entering into a contract with United, the promoters of AOTC effectively resolved to take their chances on the ability of United to arrange financing and pay the $450,000 profit. In these circumstances, it would be ignoring substantial reality to regard National's submission to the modified option as the kind of "business activity" sufficient to establish its independent corporate identity. Cf. *Moline Properties, Inc.* v. *Commissioner*, 319 U.S. 436, affirming 131 F. 2d 388 (C.A. 5), reversing 45 B.T.A. 647. See the discussion of *Moline Properties* in *Jackson* v. *Commissioner*, *supra*.

If the $450,000 received on disposition of the National stock was in effect income earned by AOTC from the sale of tankers, it follows that the distribution of that amount to petitioners was in the nature of a dividend.   It is argued that the distribution could not have been a dividend from AOTC since it was made to the 26 shareholders of National rather than to the 86 shareholders of AOTC.   Our findings indicate, however, that the allocations of both AOTC and National stock were substantially identical as of January 24, 1948, the date the option was granted.   Even after subsequent stock transfers the shareholders of National and/or their relatives, or trustees therefor, owned at least 71 per cent of the stock of AOTC, and perhaps more.   And, as recognized by petitioners on brief, it is not essential that distribution be strictly according to percentage of stock ownership in order to characterize such distribution as a dividend.   Cf. *Joseph Goodnow & Co.*, 5 B.T.A. 1154; *Lincoln National Bank, Executor*, 23 B.T.A. 1304, affirmed 63 F. 2d 131 (C.A.D.C.); *Forcum-James Co.*, 7 T.C. 1195; *Paramount-Richards Theatres, Inc.* v. *Commissioner*, 153 F. 2d 602 (C.A. 5); *Hugh Smith, Inc.*, 8 T.C. 660, affirmed per curiam 173 F. 2d 224 (C.A. 6), certiorari denied 337 U.S. 918.   However, petitioners argue that the disparity is so great "as to nullify any notion" that the amounts in question were dividends distributed by AOTC. But any disproportion in the respective stock ownership of the two corporations loses significance when it is realized that prior to the creation of National, and in contemplation thereof, it was understood by AOTC and United that all future beneficial owners of National stock would agree to sell their stock to United for $450,000; and it was to facilitate the anticipated transfer of stock to United that Casey, Holmes, and Klein retained record ownership, and Mackey, as escrow agent under the agreement of January 24, 1948, retained possession of all outstanding National stock.   In addition, petitioners' contention is further weakened by the fact that, apart from the University of Chicago, the stock in National was allotted in substantially the same proportions to the same dominant stockholders who controlled the affairs of both corporations; and the disparity exists only because they, in turn, arranged to divide the fruits of the allocation of the tankers among their nominees in a different manner. Conceivably, the Commissioner might have charged the distributions in their entirety to those stockholders on a *Lucas* v. *Earl* (281 U.S. 111) theory—i.e., that they in effect made an anticipatory assignment of profits which were then contemplated as a result of the allocation of the 3 American flag tankers to AOTC, and which would otherwise have been chargeable to them as dividends from AOTC when paid over to them; and that such anticipatory assignment could not relieve them of liability for tax on such payments.   If the Commis-

sioner had taken that position, then consistency would require that no dividend income be attributed to the nominees. But in spite of the fact that no such issue is here presented, this circumstance does explain the so-called disparity and we agree with the Commissioner's determination that the amounts in controversy do represent in substance a distribution of profits by AOTC.

Petitioners argue in their reply brief that the Commissioner, on brief, has abandoned his theory based upon a distribution of corporate earnings by AOTC. However, although it is true that the Commissioner's brief does not articulate that theory in those terms, it is replete with general arguments about substance versus form, and nowhere does it state that the theory is being abandoned. While a more precise brief would have been of greater assistance to the Court, we cannot say that the Government has abandoned the theory upon which the deficiencies were determined.

2. Petitioners are correct, however, in their contention that the final payment on the note should have been reported as income in 1949 rather than 1948. Upon this record it appears that the note was given to evidence indebtedness of $350,000, not in payment thereof. Throughout this transaction the promoting parties were interested in cash payment by United, not in its promise to pay. The original agreement of January 24, 1948, provided that United should deposit $150,000 per tanker as each tanker was delivered in order to secure its performance should it choose to exercise the option. Apparently this deposit was never made. Respondent does not contest the fact that United was in tenuous financial condition at all relevant times so as to render questionable the value of any promise it might give. Although its note was secured, we do not know the value of the security; certainly the National stock was of little value in view of National's heavy indebtedness and the virtually nonexistent charter market for the tankers. Finally, the escrow arrangement itself, whereby the note was in terms payable to the escrow agents who retained possession of the note and received all payments thereon, indicates that the note was not available to the petitioners as an equivalent of cash in any practical or commercial sense, nor was it intended to be. It follows that the fair market value of the note, if any, was not includible in income but that payments on the note should have been reported as received. *Schlemmer* v. *United States*, 94 F. 2d 77 (C.A. 2); *Robert J. Dial*, 24 T.C. 117; *Jay A. Williams*, 28 T.C. 1000.

*Decisions will be entered under Rule 50.*