**PORTLAND GENERAL ELECTRIC COMPANY, an Oregon corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 9657.**

United States District Court
D. Oregon.
Sept. 26, 1960.

Clarence D. Phillips and Alfred H. Stoloff, Phillips, Coughlin, Buell & Phillips, Portland, Or., for plaintiff.

C. E. Luckey, U. S. Atty., and Edward J. Georgeff, Asst. U. S. Atty., Portland, Or., for defendant.

EAST, Justice.

This action was instituted by Portland General Electric Company, an Oregon utilities corporation having its principal place of business in Portland within this District (PGE), to recover from the United States of America an alleged overpayment of income taxes for the period February 2, 1948, to December 31, 1948, and the calendar years of 1949 through 1953, in the asserted aggregate amount of $1,575,989.86, plus interest. PGE is an investor-held public utility engaged in the generation, transmission and metropolitan Portland-area distribution of its own and other-generated electric energy, and has been in existence in its present corporate stockholder form since February 2, 1948. PGE's predecessors in ownership and interest have existed as Oregon public utilities since well before the turn of the century. PGE in the conduct of its business had acquired and was operating during the material times a substantial plant consisting of steam and hydro-electric generation equipment, modern electricity transmission and distribution systems of towers, fixtures, poles, conductors, transformers, streetlighting equipment, metering devices and kindred properties.

Since about the year 1909 PGE's predecessors, and, since its corporate inception, PGE itself, have been subject to control and full regulation by the Public Utilities Commissioner of Oregon (Utilities Commissioner)[1] and the Federal

1. "The regulation of electric utilities in Oregon was instituted by reason of Ch. 279 of the Laws of 1911, now found in ORS Title 57, Chapters 756, 757 and 758. PGE is a public utility, as defined in ORS 757.005. Under the Oregon statutes, a public utility is required to furnish service at reasonable rates. ORS 757.020, 757.205 to 757.265. These rates are regulated by the Utilities Commissioner of Oregon and cannot exceed a reasonable amount. Valuations of utility property are required to be made by the Utilities Commissioner; ORS 757.055. Budgets and accounting are also regulated. ORS 757.105 to 757.125, inclusive.

"One of the most important aspects of the regulatory power is that over earnings. Thus, although the Utilities Commissioner cannot insure that PGE will have earnings, he can and does put a ceiling on PGE's earnings through the exercise of the power to prescribe rates which PGE must charge for its service. The method by which the Utilities Commissioner sets a ceiling on PGE's earnings is to limit earnings to a percentage of the original cost of property used and useful in the public service. The original cost is that described before, i. e., the original cost to the first entity which put the property to public service or to PGE, whichever is less.

"It will be observed that the Utilities Commissioner not only has a very broad regulation over these utilities, but has considerable knowledge and information at all times, with respect to valuations and depreciation. The subject of depreciation is provided under ORS 757.140. Under the regulatory processes, for the years in question, the Utilities Commissioner had determined the lives of property and also the rate of depreciation. However, the method of depreciation used by PGE for regulatory purposes is a sinking-fund method and is not the same as the straight-line method used for income tax purposes. However, the lives of property would be uniform under any

Power Commission. PGE and its predecessors have been at all times material to this matter in full compliance with all rules and regulations of said regulatory bodies.

The main dispute between PGE and the Defendant, acting through its Commissioner of Internal Revenue (Commissioner), arises from their respective determinations for income tax purposes of the amount of depreciation or the "reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)"[2] (Annual Accrual) of PGE's depreciable properties during the years in question. The Commissioner disallowed Annual Accruals, as developed and determined through the procedures and method of depreciation utilized by PGE, and in turn redetermined the amounts of the Annual Accrual under his procedures and method of depreciation, resulting in the assessment and payment of the asserted overpayment. PGE contends:

(a) That its utilized procedures and method of depreciation were based upon factual and practical internal experience and knowledge and the Annual Accruals resulting are reasonably allowable under the Internal Revenue Code and all pertinent regulations of the Treasury, and in turn

(b) That the practices and method of depreciation utilized by the Commissioner are based upon extrinsic and assumed factors and his resulting Annual Accruals are therefore arbitrary and unreasonable.[3]

method of depreciation. In determining the depreciation for tax purposes, the lives of property used in the tax returns are consistent with the lives of property used for regulatory purposes and have been so used for many years." Excerpts, plaintiff's brief.

2. 26 U.S.C.1952 Ed., § 23. Deductions from gross income. "In computing net income there shall be allowed as deductions:

(l) [as amended by § 121(c) of the Revenue Act of 1942, c. 619, 56 Stat. 798] *Depreciation.*—A reasonable allow-

### Jurisdiction

This Court has jurisdiction of the parties and dispute pursuant to Title 28 U.S.C.A. § 1346.

### Issues To Be Resolved

PGE at trial time waived all of its pretrial contentions of unlawful assessment, except for those matters dealing with depreciation allowance. For convenience, we will allow topical titles to the remaining issues, as follows:

(a) "Useful Lives of PGE's Properties,"

(b) "The Annual Accrual Thereon,"

(c) "Depreciation Reserve," and

(d) "Salvage."

The resolve of this narrowed dispute lies in ascertaining the full scope and purpose of the provisions for the allowance of a reasonable allowance or depreciation deduction from a taxpayer's gross income as permitted by § 23(l).

We approach this resolve with the admonition that:

"Taxation is an intensely practical matter and deals with realities. * * *,"

and further that

"In administering the income tax laws common sense interpretation and ordinary business standards should be followed." Kern v. Granquist, D.C.Or., 185 F.Supp. 769, 772, J. Kilkenny.

The "useful life of the plant" yardstick theory of the intent of Congress was expressed succinctly by Mr. Justice

ance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income."

3. It is well established that the findings or determination by the Commissioner are prima facie correct and cast upon the taxpayer the burden of disproving them. Welch v. Helvering, 290 U.S. 111, 54 S. Ct. 8, 78 L.Ed. 212.

Brandeis in United States v. Ludey, 274 U.S. 295, 300–301, 47 S.Ct. 608, 610, 71 L.Ed. 1054:

"The depreciation charge permitted as a deduction from the gross income in determining the taxable income of a business for any year represents the reduction, during the year, of the capital assets through wear and tear of the plant used. The amount of the allowance for depreciation (Annual Accrual) is the sum which should be set aside for the taxable year, in order that, at the end of *the useful life of the plant* [italics supplied] in the business, the aggregate of the sums set aside will (with the salvage value) suffice to provide an amount equal to the original cost. The theory underlying this allowance for depreciation is that by using up the plant, a gradual sale is made of it. The depreciation charges is the measure of the cost of the part which has been sold."

This language of Mr. Justice Brandeis has just been utilized to point up the necessity of computing the Annual Accrual upon the "useful lives" of property as experienced within the business utilizing it. Massey Motors, Inc. v. United States, 364 U.S. 92, 80 S.Ct. 1411, 1424, 4 L.Ed. 2d 1603.

The Commissioner rightfully suggests that the Annual Accrual to be charged off during the useful life of the property must be amortized over that life "either in equal annual installments (straight-line) or in accordance with any other rec-

ognized trade practice." Treasury Regulations 111, § 29.23($l$)–5; 118, § 39.23 ($l$)–5.

As will be seen, PGE agrees with this premise. However, the difficulty arises through the divergent procedures utilized by the Commissioner and PGE, respectively, in determining:

(a) The useful lives of PGE's depreciable property, and

(b) The Annual accrual thereon.

As an aid to public utilities in meeting the requirements of the regulations, comprehensive studies of acceptable methods of depreciation have been made, three of which will be of interest to us in this resolve, "straight-line," "sinking-fund," and "retirement" methods.[4]

Here it is noted that there is no dispute between the parties as to the "cost basis" of PGE"s depreciable properties to be recovered by depreciation allowances, except for two minor items regarding:

(a) "Costs of Rights of Way," and

(b) "Contributions in Aid of Construction," [5]

which will be dealt with in connection with depreciation reserve.

Useful Lives Of PGE's Properties

PGE computes the Annual Accrual on the basis of the useful lives of component groups of its properties, as established and determined in an order of the Utilities Commissioner issued in 1938.[6] The Commissioner, on the other hand, allowed

---

4. See "Report of the Committee on Depreciation of the National Association of Railroad and Utilities Commissioners, 1943," as supplemented in 1944. (Report).

5. "* * * the cost basis of taxpayer's properties has been largely stipulated. (Pretrial order, pars. IV, VI, VII and Exhibit A). The only disputes as to depreciable basis deal with whether the cost of certain rights-of-way are depreciable and whether contributions in aid of the construction of certain properties may be added to the depreciable base." Excerpt, defendant's trial brief, pp. 9, 10.

6. To determine depreciation, the Utilities Commissioner in 1936 authorized a study to be made of the useful lives of PGE's property. The study was conducted by J. P. Newell, an expert hired by PGE, and Melwood W. Van Scoyoc, then Chief Accountant for the Public Utility Commission. These experts spent considerable time studying the retirement experience PGE had with respect to its property and filed their joint report with the Utilities Commissioner. Following a hearing, the Utilities Commissioner issued his Order No. 5362 (PGE's Ex. 64) which reviewed in detail the joint study and ordered PGE to depreciate its

an Annual Accrual equal to 2.8% of PGE's depreciable property. These reconstructed "average lives" were developed by George V. Robinson, an engineer agent for the Internal Revenue Service, from a study of data and records furnished him by PGE during the years 1956-7. The Commissioner's resulting determinations were made by utilizing a hindsight "turn over" accounting method evaluated through the agent's inspection of PGE's records, his knowledge of PGE's depreciable properties and properties of other utilities examined by him.[7]

property for regulatory purposes on the basis of estimated service lives set forth therein. The joint study of Newell and Van Scoyoc estimated useful service lives of all of PGE's then depreciable property, except that involved by the Oak Grove Project, which was the subject of Federal Power Commission regulation (Ex. 64, p. 10). As described in the Order, the study

"* * * embraced a detailed analysis of the company's records and all other facts affecting its depreciation rates. While the company's depreciation records are by no means as complete and perfect as would be desired, yet they are much more so than those of the average utility.

"It must be remembered that this company and its predecessors were operating utility property prior to 1893 and that it was not until 1913 that a Uniform System of Accounts was placed into effect. It has been possible, however, in most cases to depend largely *upon the company's experience in determination of life and service of units or classes of property. Particularly this is true with respect to the shorter life units.*" [Italics supplied.]

The primary object of the study, then, was to determine estimated service lives based upon the actual experience of PGE as reflected in its own records and therefore the estimated service lives as determined by the Utilities Commissioner in his order were based upon this actual experience.

Furthermore, PGE claims the correctness of the estimated useful service lives determined in PGE's Exhibit 64 is reinforced by the results of the follow-up studies of Mr. Wildfong during 1953, based upon completed property records as of the close of 1952. Using modern methods of analysis and having the benefit of an additional 14 years of retirement experience of PGE, Mr. Wildfong ascertained that the lives set forth in the 1938 report (PGE's Ex. 64) were sufficiently accurate as to warrant their use in 1953. (Tr. 370). A comparison of the total amount of depreciation claimed on all returns using the Utilities Commissioner's lives and that calculated using 1953 lives is as follows:

| Year | Per Return Before credit adjustment | 1953 Study | Difference |
|---|---|---|---|
| 1948 | $2,216,791 | $2,181,480 | $ 35.311 |
| 1949 | 2,441,927 | 2,425,014 | (9,087)* |
| 1950 | 2,670,264 | 2,644,355 | 25,909 |
| 1951 | 2,911,609 | 2,890,612 | 20,997 |
| 1952 | 3,099,769 | 3,082,067 | 16,902 |
| 1953 | 3,283,257 | 3,267,074 | 16,183 |

(* denotes negative figure)
Excerpts from plaintiff's brief.

**7.** "Q. In the absence of actuarial data, Mr. Robinson, what methods do you customarily follow in determining the reasonableness of the depreciation claimed?

"A. Well, my work being limited by nature to a review of the rates and depreciation claimed, and considering the data available or furnished, which is nothing more than the usual turnover, what is adaptable to the usual turnover studies, or the usual turnover methods, I reviewed the average lives as furnished me by Mr. Wildfong (PGE's accountant) by accounts. I reviewed the item accounts of structures, and things of that kind, rather from the remaining life basis, *and assigned lives* [italics supplied] and determined depreciation allowable and submitted a report in March, 1957.

"Q. Mr. Robinson, I believe my question was intended to refer to the methods which you customarily employed. You mentioned the turnover method. Is that one method or is it a family of methods?

"A. Well, the turnover methods are several in number, all adapting themselves to the type of data which we have in this case. There are two or three turnover approaches. The retirement ratio and the geometric mean are those most commonly used, and those which I used except that I did cross-check and further checked *from my experience elsewhere* [italics supplied] and compared the results with other results that I have found on other studies on the over-all picture, and then recognized the 10-per cent salvage that I mentioned a moment ago in my over-all calculations."

The Commissioner presented similar testimony at the trial.[8]

PGE says its method was to depreciate its depreciable properties in equal annual installments over the useful lives of the component groups thereof in accordance with the straight-line method authorized by the Commissioner—Regulation 111, § 29.23(*l*)-5. Further, that this procedure and method permits it to recover the cost of its depreciable property as that property is consumed over its reasonably forecast useful life, all according to pattern established by past experience (straight-line unit summation method). The Commissioner contends that PGE is permitted only to recover the cost of its depreciable properties under his reconstructed "average life" method of units placed in a group of similar properties (straight-line average life method). Consequently, it appears that when PGE speaks of useful lives it means useful lives of its depreciable properties broken down into component groups and measured by actual past retirement experience (unit summation procedure), and when the Commissioner speaks of useful lives he means the reconstructed average life of all property within a functional group (group procedure).[9]

8. "Q. What is your opinion, Mr. Goldthwaite, as to the reasonableness of the *length of lives shown for each of the* group accounts?

"A. Comparing them with lives that I am familiar with in my experience and with which I have had a good deal to do in determination, in investigation of actual experience, they are low, that is, conversely the depreciation rates are high compared to what I would expect in my experience when you compare them account by account, that is, for each class of property separately.

"That's going no further than just examining those figures, and then comparing them with *what I have known elsewhere.*" [Italics supplied.] (Tr. 636.)

"Q. Would one method of determining whether there was a sharp variance between any of the property within the property groups be a comparison of the average life of the assets within each of the plaintiff's property groups with the average lives of the property groups of the comparative companies?

"A. Well, I would only say it's a tentative comparison. It's a first shot, and I can't claim in making it any knowledge whatever of the Portland General Electric property except as represented by the dollars set forth in certain tabulations that I have examined.

"So I can't say, *except from general knowledge,* that there is a good deal of general similarity in the distribution accounts in the nature of the property, but there might be considerable differences too, particularly as to life. You might have conditions out here which influence life considerably that don't affect us in the East, in the territories of the companies I speak of." [Italics supplied.] (Tr. 687.)

9. On page 61 of the Report (n. 4) the straight-line method is defined as a method by which "the cost of depreciation is spread in direct proportion to the expiration of the estimated service life of the property."

On page 195 of the Report appears the following:

"For the case of the dispersion of retirements over various ages according to a given mortality pattern two procedures for applying each of the three depreciation methods are presented in this section. These are referred to as the *unit-summation* procedure and the *group* procedure.

"The *unit-summation* procedure considers each retirement group (that is, the group expected to be retired at each given age) separately, and sets up the annual and accrued depreciation for each such part of the plant on the basis of the probable life of its retirement group. This is done successively for all retirement groups. These results are then summed up to give the composite annual depreciation charge on all surviving plant for *each* calendar year. * * *

"Under the *group* procedure a basic constant annual depreciation rate is determined, which when applied from year to year to all surviving plant will furnish the required depreciation reserve such that the reserve will be exactly balanced out when the last retirement is made (with due allowance for salvage).

"It will be noted that under the group procedure one constant annual depreciation rate is applicable on all retirement groups, and hence this rate is the same for all ages. In contrast, under the unit-summation procedure the annual depreciation rate varies for different retirement groups and thus the composite annual depreciation rate applicable to all

PGE says that its depreciable properties may be classified into three main categories:

(a) The first category includes the Mass Property Accounts, each consisting of many units, all having the same function but having different probable lives. Samples of such property accounts are wood poles, overhead lines of distribution, etc. They comprise approximately 82% of PGE's property.

(b) The second category consists of the Reservoirs, Dams and Waterway Accounts, having specific life expectancies which can be identified in advance.

(c) The third category consists of the Structures and Improvements Accounts. Here each major building consists of the structural shell of relatively long life, within and to which is attached a variety of short-lived items—lighting, plumbing fixtures, partitions, and such. This account represents a mixture or grouping of the first and second categories of properties, either of which is worthless without the other.

It appears from PGE's Mass Properties that the experience has been that a large number of similar items installed in any one year (called a "Vintage") will be retired fairly soon after installation, some will be in service longer, and some will reach a fairly advanced age before retirement. For example, PGE cannot accurately predict the service life of any particular pole of a large number installed in a vintage, but it can from its own past experience reasonably predict that a certain percentage will be retired at the end of the first year and that varying percentages will be retired in successive years.

Throughout the years the matter of useful service lives was of such great importance in the regulation of rates to be charged that the Utilities Commissioner ordered continuous life studies to be made and periodically reported to him. PGE completed a number of life studies of its properties, two of which were introduced into evidence in this case.

In contrast to this past actual experience and practical procedure as used by PGE in determining the useful lives of its depreciable properties, the Commissioner used Mr. Robinson's study and development of reconstructed average lives for groups of units of PGE's depreciable properties. The Commissioner overlooks the actual experience had by PGE and substituted information substantially gained from extrinsic experience and evidence.

As in the case of Mass Properties, the assigning of an average life to all units of a single vintage forecasts the same life for all such units.[10] This is unrealis-

---

survivors of a given age, varies with time."

It is apparent that unit summation is a procedure which may be applied to compute straight-line depreciation or sinking-fund depreciation. Excerpts, plaintiff's brief.

10. For example, Commissioner treated wood poles as if they all had the same life expectancy. But not all wood poles have the same life expectancy. The undisputed evidence is that the dispersion in life expectancy in wood poles ranges from one year to 40 years or more. (Tr. 193; Deft's Ex. 2). If the dispersion were narrow so that most wood poles lived to about 24 years, few retiring not much earlier and few retiring not much later, it might seem logical to group them and say that the average life of the group was 24 years. But where the dispersion is much wider as is the case in wood poles, so that very few of them actually live to the theoretical average life of the group (Tr. 193), it is illogical to put them all into one average life group.

On page 76 of the Report

"On the group basis the average life of all the units within the class of depreciable plant is used as the service life, and depreciation expense and depreciation reserve are computed for this class of plant as a whole. To illustrate the group plan, if there are 3 units of equal costs with lives of 4, 5 and 6 years, respectively, the depreciation would be based on a life of 5 year (the average of 4, 5 and 6), or an annual rate of 20 per cent. Depreciation at this rate on the cost of surviving plant would be con-

tic and therefore unreasonable. It is basic that not all units retire at the average age. It necessarily follows that early retirements in the vintage are underdepreciated, and long-lived items are correspondingly overdepreciated.

This practice fails to acknowledge the element of dispersion—dispersion describing the self-evident fact that *not all* property installed in one year will live for an average life of that property. It appears that the Commissioner's agents never made any attempt to determine the range of lives of PGE's depreciable property, which practice was condemned in Vegetable Farms, Inc. v. Commissioner, 9 Cir., 1951, 191 F.2d 677.

■ This Court feels, as did the Court of Appeals for the First Circuit in Boston & Maine R. R. v. Commissioner of Internal Revenue, 1953, 206 F.2d 617, that there is no conflict between the requirements of the Utilities Commissioner and the Federal Power Commission for rate regulatory purposes on the one hand, and the Internal Revenue Code and Treasury Regulations for income tax purposes on the other. Therefore, PGE's substantial adherence to a pattern and policy put down some 22 years ago by the regulatory bodies lends a strong credence to the soundness and reasonableness of its accounting practice and provides a factual and reasonable basis for determining the useful lives in service of PGE's depreciable properties. In this line, look at the

Commissioner's asserted test of reasonableness:

"Reasonableness depends upon two pivotal considerations, first, it must accurately reflect the actual depreciation currently taking place in the taxpayer's plant, second, the method of calculating this current depreciation must be administratively practical in its computation, as well as its verification."

It appears that the useful lives of the various categories of PGE's depreciable properties as found by the Utilities Commissioner and Federal Power Commission, and as reported in its returns, fully meets this test.

■ This Court concludes that PGE's procedure of determining and utilizing "useful lives" is based upon the intimate knowledge of its properties, later studied and approved by the regulatory agencies, and there is no logical reason why there should be any difference between "useful lives of properties" for regulatory purposes on one hand and income tax purposes on the other. Furthermore, the Commissioner's procedure in ignoring undisputed dispersion of life expectancies and of utilizing his reconstructed average lives of PGE's depreciable properties, as above noted, is arbitrary and unreasonable in view of the known experience of PGE to the contrary. Northern Natural Gas Co. v. O'Malley et al., 8 Cir., 277 F.2d 128, 137.[11]

tinued so long as any of the units were in service. Thus, at the time of the retirement of the short-lived item (i. e., the one retired at less than average service life), there would be insufficient reserve against it. This shortage would be made up by the continued accrual on the long-lived item.

"Another way of dealing with groups of items having mortality dispersion and one which in theory *avoids* the *underaccrual* on *short-lived* items and the *overaccrual* on *long-lived* items [italics supplied] is the 'unit summation plan.' Under this plan each subgroup having the same life expectancy carries its own annual depreciation rate. The depreciation rate at each age for the group as a whole is a weighted summation of the

rates for the individual subgroups. In the example above, in the first four years the rate would be 20/56 per cent, in the fifth year it would be 18–1/3 per cent, and in the sixth year it would be 16–2/3 per cent. Thus the rate is higher in the early years and lower in the later years than the constant annual rate of the group plan."

11. "In resting its case upon the annual estimate of reserves, we are aware that the taxpayer was following the requirements of the Federal Power Commission. This is the basis for passing upon such matters as the taxpayer's applications for certificates of extensions of facilities or the adequacy of proposed rates for gas to be sold. It is also the basis used by the taxpayer in preparing reg-

### The Annual Accrual

We have determined that the useful lives of PGE's depreciable properties, as claimed by it, are reasonable and that there is no just reason why PGE should be compelled by the Commissioner to change to his standard of reconstructed average lives. Now we should determine whether the Annual Accrual as computed by PGE's procedure of applying unit summation to either "straight-line" method of depreciation (for tax purposes) or "sinking-fund" method (for rate regulatory purposes) is consistent and reasonable,[12] or whether there is justification on the part of the Commissioner to require PGE to discard its and accept his procedures and methods of computing a lower Annual Accrual.

■ We pause to recall that PGE and its predecessors during the years, for book purposes, has used the sinking-fund method of depreciation in complying with State and Federal rate regulatory requirements, nevertheless, PGE claims it is entitled to use the straight-line unit summation method of depreciation for income tax purposes during the years in question.

This it may do, as the two methods are independent of each other for respective uses and are not in and of themselves inconsistent with each other. Depreciation for book purposes has absolutely no relation to depreciation for tax purposes. Depreciation for tax purposes is authorized by the Internal Revenue Code, whereas depreciation for rate purposes is required by State law for the purpose of control over rates to be charged consumers. The sinking-fund method is satisfactory under book value purposes only

---

istration certificates for the Securities and Exchange Commission, and for reporting information to investors and prospective investors in the taxpayer's securities.

"Generally it is the basis used by management in the conduct of the affairs of its business; it turn, all of the agencies, investors, and financial institutions with which the taxpayer deals base their action on the reserves owned or controlled by the taxpayer.

"We have examined the record and believe that the taxpayer has produced all the evidence that was reasonably available to it bearing upon the quantity and life of its reserves. Our examination of the trial court's opinion leads us to believe that he reached a similar conclusion. *The trial court, however, apparently was of the view that a different standard is imposed in tax cases, and that proof that would satisfy other agencies as to the extent and duration of the reserve would not serve such purpose in the present case. We have no doubt that Congress could specify that different standards be used in determining reserves and reserve life in tax cases. However, Congress has not prescribed any special standards to be considered in the depreciation field.* We therefore believe evidence that is sufficient to establish reserves and reserve life in proceedings before the Federal Power Commission, the Securities and Exchange Commission, and for general purposes, should afford

sufficient evidence for tax purposes." [Emphasis supplied.]

12. It is apparent that unit summation is a procedure which may be applied to compute straight-line depreciation or sinking-fund depreciation. This is what Dr. Cowles, witness for PGE, said:

"To avoid confusion we normally refer to the basic technique as the method; that is, straight-line, sinking fund or declining balance as the method, and its modified technique as the procedure. So you might say you could compute the depreciation by using the straight-line average life, or straight-line unit summation or sinking fund unit summation or sinking fund average life." (Tr. 474).

and also what Mr. Wildfong, witness for PGE, said:

"A. Well, unit summation is not a method. Unit summation is a procedure for accounting for the varying lives that occur within a property account. It is applicable whether you are measuring—whether you are using a straight-line method, sinking fund method or any other method as the economic measure of the cost of this depreciation.

"In other words, given a straight-line method to be applied, then unit summation is a procedure whereby you take into account these varying lives which will occur within the account." (Tr. 298).

because the Utilities Commissioner takes such method into consideration in determining rates by computing allowable earnings on original cost, not taking into account accrued depreciation.

The sinking-fund method does not provide an annual depreciation allowance which reflects the actual loss or use of the asset during the year. As Mr. Goldthwaite further testified:

" * * * and if you were asking me as between sinking fund depreciation and any kind of straight-line depreciation, if sinking fund depreciation might conceivably provide adequate accruals in the early life, my answer would be a positive no. I think I can show, and have shown in testimony and in argument over long years, that sinking fund is inadequate to express the rate of accrual of depreciation, and a sinking fund depreciation reserve, even if properly kept. Even if properly kept, with all due regard to its certain defects, is inadequate to express the accrued depreciation in such property at any particular time * * * " (Tr. 642.)

The Internal Revenue Code requires that the annual depreciation allowance reflect the actual depreciation sustained during the year. Consequently, sinking-fund depreciation cannot provide adequate depreciation under the requirements of the tax laws, and cannot be validly compared with straight-line depreciation. PGE has not changed its accounting methods for the purpose of taxation, let alone having changed its methods without first securing the consent of the Commissioner, as is contended by the Commissioner.

The most common method used by taxpayers is the straight-line method, which results in equal Annual Accruals throughout the reasonably pre-determined useful life of the asset. It will be shown that this is the method which both PGE and Commissioner use. PGE applies it to the useful life of property broken down into groups having similar life expectancies, whereas Commissioner applies it throughout the reconstructed average lives of property taken in functional groups.

It has long been established that an arbitrary straight-line average life or fixed percentage method advocated by the Commissioner must bow to a reasonable method employed by a taxpayer which is based on more intimate knowledge of the assets to be depreciated. For example, in Cumberland Glass Mfg. Co. v. United States, Ct.Cl.1930, 44 F.2d 455, 461, it appeared that depreciation had been taken by the taxpayer in the following manner. At the end of the year certain officials of the company who were familiar with the business of the taxpayer and who knew the property, inspected the property and determined an annual accrual, taking into account the age of the property, its probable useful life, and current repairs and replacements. The Government sought to substitute an annual accrual based upon lives as determined by the Commissioner of Internal Revenue. The Court said:

"In the instant case the depreciation charged off each year for the period from June 30, 1910, to June 30, 1916, was determined by officials of the company who had been connected with the management for many years and who possessed accurate and technical knowledge of the plant, its assets, and equipment. They were familiar with the actual use and operation of the plant, knew the age, cost, and probable useful life of its various items of equipment, and the current cost of repairs and replacements.

"That they acted in the utmost good faith and exercised their best judgment in estimating the depreciation charged off each year is not questioned.

"While the straight-line or fixed percentage method used by the commissioner in determining plaintiff's allowable depreciation for the years

from June 30, 1910, to and including the fiscal year ended June 30, 1917, is the one most generally used in determining depreciation for tax purposes, and is quite generally accepted as the simplest and most accurate of the various methods used, computation made on that basis can not stand where the facts in a particular case, as here, show that the result reached by the use of such methods would not be a reasonable allowance within the meaning of the statute.

"The facts in the case bring it within the rule announced in the decisions cited that depreciation in each case must be determined by the particular facts of such case, and that a computation based on a fixed percentage deduction during estimated probable useful life will not be accepted as the reasonable allowance provided by the statute where the facts show the actual depreciation sustained and charged upon the books was reasonable, and was an amount different from that found by the use of such method of computation. We think the method used by the plaintiff for determining depreciation during the year in controversy established more accurately than the straight-line method used by the commissioner the reasonable allowance for wear and tear it was entitled to charge off its books each year."

A similar case, and one cited with approval in Cumberland, supra, is Geuder, Paeschke & Frey Co. v. Commissioner, 7 Cir., 1930, 41 F.2d 308; see also Kerr-Cochrane v. Commissioner, 30 T.C. 6, where the Court allowed a taxpayer to depreciate a warehouse building twice as fast as that contended for by the Commissioner, based upon evidence of the particular nature of the consideration.

This is exactly what occurred in Shainberg et al. v. Commissioner, 33 T.C. No. 28 (Nov. 10, 1959), when the Court rejected the Commissioner's composite method and approved the taxpayer's computation of the annual accrual on a component-grouping method; that is by segregating the taxpayer's property into groups having similar useful lives and then computing depreciation for each group on the declining-balance method at twice the straight-line rate. The aggregate of these group depreciation sums during the year in question was held to be a reasonable annual accrual for that year.

For a pictorial and word description of the difference between the Commissioner's average life straight-line method and PGE's straight-line unit summation method of determining annual accrual of depreciation, see Appendix A.

Furthermore, this Court suggests that the Commissioner has authorized the use of unit summation as a procedure in determining Annual Accrual upon the straight-line method. See example, page 6, Bulletin "F" revised January, 1942 (issued by the Internal Revenue Service).[13]

"For example, if a building has an estimated life of 50 years and costs $100,000, the depreciation rate without retirements would be 2% per year. However, if it is estimated that at the end of the 25 years elevators costing $10,000 would have to be replaced, the resulting depreciation rate would be computed— $90,000 at 2% and $10,000 at 4%, resulting in an average rate for the property of 2&3/10%. Assuming that the replacement cost of the elevators amounts to $10,000, application of that rate to the basis of $100,000 would recover the total investment of $110,000 over the 50-year period." CCH 1948 § 219.283.

The method suggested in Bulletin "F" is precisely the same method of computing depreciation as used by PGE. Thus, the $90,000 portion of the building hav-

---

13. This Bulletin was given high prestige in Massey.

ing a useful life of 50 years is depreciated over that period and the $10,000 portion depreciated over its shorter life of 25 years as follows:

| | Life | Annual Accrual | |
|---|---|---|---|
| $ 90,000 | 50 years | 1800 | $\left(\dfrac{90,000}{50 \text{ yrs.}}\right)$ |
| 10,000 | 25 years | 400 | $\left(\dfrac{10,000}{25 \text{ yrs.}}\right)$ |
| $100,000 | | 2200 | |

$$\text{Depreciation Rate} = \frac{2200}{100,000} = 2.2\%$$

$$\text{Composite life} = \frac{1}{.022} = 45.45 \text{ years}$$

— ◆ —

At the time the first elevator is retired at the end of 25 years, it will have been fully depreciated and a new elevator at a cost of $10,000 will replace it, which will in turn be depreciated over 25 years.

The foregoing should be compared with the average life method. To determine average life, the following computation is made, as explained by Mr. White (Commissioner's witness):

$$90,000 \times 50 = 4,500,000$$
$$10,000 \times 25 = 250,000$$
$$4,750,000$$
$$\text{Average life} \quad \frac{4,750.000}{100,000} = 47.5 \text{ years}$$

— ◆ —

The rate of depreciation based upon the average life is $\frac{1}{47.5} = 0.02105$ and the Annual Accrual is $2105. A comparison of the composite life and the average life in the example clearly shows the mathematical correspondence between the two concepts.

■ Since depreciation on an item basis is preferable to that on a group basis, Roanoke Mills v. Commissioner, 18 B.T.A. 474, it must follow that depreciation by unit summation procedure is preferable to that of average life procedure.

The unit summation procedure was approved in Reed v. Commissioner, 6 B.T.A. 1140. There, petitioner owned a dam, one-fourth of which was destroyed on March 1, 1920, and reconstructed. The useful life of the dam on March 1, 1913 was 32 years. The useful life of the new portion was 40 years. The Court said:

"The March 1, 1913, value of the dam in question was $12,000, and it should be depreciated on the basis of the useful life, as determined, down to March 1, 1920, to determine the residual value of the dam on that date. One-fourth of the residual value of the dam on March 1, 1920, should be allowed as a loss and depreciation computed for the calendar year 1920 on the useful life as determined for the three-fourths of the old dam remaining and depreciation allowed based upon the useful life for the new part of the dam, construction of which was completed on July 1, 1920, and from which date depreciation should be allowed."

Here, as before, the average life of the dam after reconstruction was not used at all. Instead, each part was depreciated over its own useful life.

As stated before, the Commissioner asserts upon PGE through its computation of allowable depreciation a rate of 2.8% during the years in question.

Page 22 of PGE's Exhibit 9 is a Commissioner's computation which shows that he has consistently lowered the depreciation rate on PGE's property from 3.334% in years prior to 1948 to 3% in the original proposed deficiency assessments for the years in question, and, finally, to 2.8% as assessed for these years. While the Commissioner was lowering PGE's depreciation rate, the amount of PGE's long-lived production equipment dropped from more than 40% of total plant to less than one-fourth in the period 1940–1953. At the same time, short-lived transmission and distribution equipment increased from 52% to 71% in the same period, as shown on PGE's Exhibit 46, reproduced below:

### Portland General Electric Company

Percent of Depreciable Property by Functional Groups for the Dates Indicated

| Class of Property | Percent of Total Depreciable Property | | |
|---|---|---|---|
| | January 1, 1940 | January 1, 1948 | Dec. 31, 1953 |
| Production Plant | 43.05 | 34.12 | 24.57 |
| Transmission Plant | 8.19 | 8.94 | 11.25 |
| Distribution Plant | 43.72 | 52.34 | 59.87 |
| Other | 5.04 | 4.60 | 4.31 |
| Total | 100.00 | 100.00 | 100.00 |

The Commissioner cannot justify the lowering of PGE's depreciation rate in the face of the changing character of its property from relatively long-lived to short-lived in view of the admissions of the Commissioner's witnesses, who agreed that short-lived property must be depreciated at a higher rate than long-lived property.[14]

This Court concludes that the Annual Accrual of allowable depreciation, as computed by PGE under its straight-

14. Cross-examination of Witness Goldthwaite, Tr. 722:

"Q. Yes. So that if there has been investment through the last several years or decades of sizable amounts of dollars placed in here, the majority of which went into short-lived property as distinguished from long-lived property, the company should have a higher rate as compared to its earlier years, shouldn't it, a higher annual rate of depreciation?

"A. I would think so.

"Mr. Phillips: Yes, you would think so. That is all."

Cross-examination of Witness Robert Pearson White, witness for the Commissioner (Tr. 871):

"Q. Yes, that it right. If you put in more short-lived property and didn't put in more long-lived property, your ratio has to change, doesn't it, and also your rate of depreciation? A. Well, but their transmission plant went up, too, from 1945 to 1953.

"Q. That is right. And transmission plant is short-lived property, too, isn't it? A. And that went up.

"Q. That went up from 8.19 to 11.25. A. Yes, that is true.

"Q. Wouldn't that indicate to you that in the year 1953 they should have a higher rate of depreciation than they had back in 1947, for instance? A. Not if the rate they had in 1947 was

line unit summation method of depreciation using the useful lives of its depreciable property as established by the Utilities Commissioner's order and subsequent usage and experience thereunder, is factual, realistic and administratively practical, and therefore reasonable and in compliance with tax law and regulation.[15] Further, that the Annual Accrual of depreciation as developed by the Commissioner on his straight-line average life method is unreasonable in light of PGE's knowledge and experience as to the useful lives of its depreciable properties, and to require PGE to substitute his method for its, is arbitrary. Shainberg v. Commissioner, supra.

### Depreciation Reserve

A serious difference exists between the parties as to the proper amount to accept and use in their respective methods of computing the Annual Accrual as the entry of "Depreciation Reserve". The Commissioner contends for a reserve as of February 2, 1948 of $29,812,574.19, whereas PGE contends for a reserve of $23,731,440.19. This difference concerning the amount of reserve as of February 2, 1948, arises as follows:

(1) PGE contends for an "opening reserve" as of December 31, 1916 of $401,005.60, whereas the Commissioner contends for an opening reserve as of that date of $2,079,802.

(2) In 1942, the parties settled PGE's tax liability for 1936, the principal issue being depreciation. In negotiating the settlement, a letter (Letter) was written by Mr. R. E. Brennan, then treasurer of PGE, dated December 21, 1942.[16] Com-

---

too high, based on the 1947 calculations.
 "Q. Do you think that might have been too high? A. I have no way of knowing that.
 "Q. You have no way of knowing that. But whatever rate they used, if it was an accepted rate, under this hypothesis wouldn't you expect a higher rate, then, in 1953? A. If the rate was correct and admitted to be correct by all parties in 1947, and if, as you say, the production plant is long-lived property and distribution plant is short-lived property, then the rate in 1953 would be higher; but not otherwise."

15. 4 Mertens, Law of Federal Income Taxation (Rev.), § 23.31, p. 61, states:
 "Whether any method adopted by the taxpayer will be acceptable to the Commissioner depends upon the accuracy with which such method reflects actual depreciation as well as administrative practicability. A method which contains the elements of accuracy and administrative practicability is thus deemed reasonable within the meaning of the Code and Regulations."

16. Ex. E, Pretrial Order:
 "December 21, 1942
 "Mr. Virgil Bean, Head,
 "Pacific Division, Technical Staff,
 "702 Bedell Building,
 "Portland, Oregon.
 "Dear Mr. Bean:
 "Enclosed, in executed form, is Treasury Department Form No. 873 entitled 'Acceptance of Proposed Overassessment' indicating for Portland General Electric Company an income tax overassessment in the amount of $898.83 for the taxable year ended December 31, 1936. A statement, reflecting the manner in which this amount of refundable tax is calculated, is also transmitted herewith.
 "It is my understanding that the additional depreciation deduction of $31,088.-85 shown in the above identified statement was determined by using an average depreciable base for 1936 of $46,064,-154.23 less an adjusted reserve for depreciation at the beginning of that taxable year of $14,759,655.77, thereby arriving at a depreciable balance for that year of $31,304,498.46; further, that such depreciable balance ($31,304,498.-46) was assigned a remaining life of 19½ years from December 31, 1935 resulting in a depreciation deduction for the calendar year of 1936 of $1,605,358.-82.
 "It is understood that the adjusted reserve for depreciation used in the above computation is for *settlement purposes only* and that the company *does not concede* that it represents the amount 'allowed or allowable' in the preceding taxable years. In the event that the Bureau of Internal Revenue computes depreciation for taxable years subsequent to 1936 on a basis different from that used in determining the depreciation deduction of $1,605,358.82 applied to the calendar year of 1936, this company hereby reserves the right to take whatever action with regard to the aforesaid depreciation deduction for the calendar year 1936 which may then appear to be appropriate under the circumstances pre-

missioner contends that the Letter constitutes an agreement between the parties as to a reserve for depreciation as of December 31, 1936. However, Commissioner agrees under the stipulation of the parties attached to the pretrial order entered herein that if the Letter does not constitute an agreement, then the accumulated depreciation for the years 1917 to 1920, inclusive, 1927 to 1930, inclusive, and 1936, are as claimed by PGE.

As to the opening reserve as of December 31, 1916, it appears that in 1906, PGE's predecessor used the retirement method of depreciating property, whereby the cost of property replaced or retired was charged against income or surplus and no annual depreciation was taken. Commencing in 1913, the terms of a bond indenture required PGE's predecessor to reserve for the replacement and maintenance of property amounts not less than 15% of its gross revenue. Commencing with the year 1913 and to January 1, 1917, provisions based upon this indenture were charged to income as maintenance expenses for depreciation. Replacements and redemption during this period were not entirely offset by the provisions made under the bond indenture, and additional allowances were added to the retirement reserve based upon the indenture requirement, and as of 12/31/1916, the total reserve under this retirement procedure was $401,005.60. Following 1917, the predecessor changed

from the retirement method to a depreciation method (which depreciation provision was taken on its tax returns) and made provision for depreciation in accordance with the method determined by the Public Service Commission of the State of Oregon, pursuant to valuation and depreciation studies which had been completed for these properties pursuant to the Oregon statutes adopted in 1911 establishing the Public Service Commission.

The Commissioner contends that as of January 1, 1917, when the predecessor changed from a retirement method of accounting to an annual depreciation method, it was required to set up a reserve equivalent to a theoretical amount of depreciation sustained as to its property as of that date, for which provision had not been made because it was on the retirement method. This is the reason for the Commissioner's assertion of the $2,079,802 reserve.

This Court concludes that a taxpayer changing from a retirement method to the depreciation method as was above done, is not required to make such an adjustment to the depreciation reserve, as claimed by the Commissioner, under § 113(b) (1) (B) and (C), I.R.C. 1939, 26 U.S.C.A. § 113(b) (1) (B, C). Kansas City Public Service Co. v. United States, D.C.W.D.Mo.1951, 100 F.Supp. 105, (Government appealed to 8 Cir., 1953, dismissed on Government's motion, 201 F.2d 513), is clear authority for this position.[17]

---

vailing at that time. Subject to the above stated qualification, the company agrees not to file or prosecute any claim for refund of income taxes for the calendar year of 1936 other than the amount of $898.83 shown in the above referred to Form 873, Acceptance of Proposed Overassessment. [Italics supplied.]

> "Very truly yours,
> "(Signed) R. E. Brennan
> Treasurer

"REB/AC
"CC A. N. Williams,
 Technical Staff
 "Mr. Geo. Oefinger AA & CO
 "Mr. Snyder
 "Mr. Polhemus"

17. Kansas City was based upon Los Angeles & Salt Lake R. R. Co. v. Commissioner, 4 T.C. 634, and its teaching has been consistently followed by the Courts. See Boston & Maine R. R. v. C. I. R., 1 Cir., 1953, 206 F.2d 617; Commissioner of Internal Revenue v. Union Pacific R. R. Co., 2 Cir., 1951, 188 F.2d 950; Denver & Salt Lake Ry. v. Commissioner, 24 T.C. 709 (citing Kansas City); Chicago & North Western Ry. Co. v. Commissioner, 29 T.C. 989; Akron, Canton & Youngstown R. R. Co. v. Commissioner, 22 T.C. 648 (citing Kansas City).

In Kansas City, the taxpayer was on the retirement method between 1926 and 1934. It did claim during this period for tax purposes certain amounts of depreciation based upon a fund required to be accumulated and retained by it for maintenance purposes under its franchise. In lieu of a better name, this was called "Depreciation" on its tax returns. After January 1, 1934, plaintiff changed from the retirement method to the straight-line method, and became entitled to allowable depreciation. In 1944, certain property was retired and its adjusted basis then became an issue. The Government contended that this basis should be adjusted by considering depreciation between 1926 and 1934. Plaintiff, on the other hand, contended that because of its own retirement method it should not be charged with such depreciation, but only with that amount taken under its franchise. The Court held for plaintiff.

Both taxpayers were on the retirement method, amounts were set aside as a special fund for maintenance and replacement purposes under the franchise in the Kansas City case, and under the bond indenture of PGE, and both changed from the retirement to the depreciation method. Under the authority of Kansas, PGE should be entitled to a depreciation reserve as of January 1, 1917 of no more than the $401,005.60 set aside as depreciation under the bond indenture.[18]

█ Now, turning our attention to the Letter, a mere perusal shows it to be an assumption on the part of PGE of the adjustment to the reserve account solely for the purpose of reaching a compromise settlement of PGE's claim of refund because of an overassessment by the Commissioner. Mr. Brennan makes it crystal clear that no mutual agreement fixing the amount of the reserve as claimed by the Commissioner was even contemplated between the parties, let alone mutually reached. Let the Commissioner be bound by his pretrial order stipulation.

### Costs of Rights of Way

█ PGE has shown by the evidence the date of the acquisition and assigned costs of clearing the rights of way in question and that these properties were depreciated over the useful lives of the properties with which the rights of way are associated.[19] These costs are proper items to be made a part of the cost basis of PGE's depreciable properties. Northern Natural Gas Co., supra, reversing the District Court, 174 F.Supp. 176, relied upon by the Commissioner in opposing these costs. Union Electric Co. v. Commissioner, 8 Cir., 1949, 177 F.2d 269, 10 T.C. 802.

### Contributions in Aid of Construction

█ PGE now concedes that these amounts claimed during the years in question are not properly included in the cost basis of its depreciable properties and were properly disallowed. However, it appears that in addition to this disallowance, the Commissioner also eliminated the contributions made with respect to properties retired before the years in question. It appears that at the time PGE retired the properties, the cost of the contributed property was removed from the cost of PGE's depreciable properties. This deduction for prior years is in effect a double disallowance for the same costs in contribution, and must be rectified by the Commissioner. There is no merit to the Commissioner's position that counsel for PGE during his opening statement waived PGE's claims to these items. Therefore, the deduction of this item from the "cost basis" of PGE's depreciable properties, to the extent of the retired properties, should be reinstated as claimed by PGE.

### Salvage

" * * * salvage is made up of two elements. The first is scrap value at the end of usefulness, whatsoever the equipment may be, and

---

18. This position PGE has maintained consistently in all of its dealings with the Bureau of Internal Revenue, and in fact, is the exact sum set up on its account-ing for depreciation for federal tax purposes. (PGE's Ex. 81).

19. PGE's Ex. 33. Tr. 264–6.

the other is an apparent salvage—not necessarily a true salvage, but an apparent salvage which is brought about by reuse, a moving about of · materials and reuse under prescribed accounting." (Mr. Robinson —Tr. 918)

 In PGE's income tax returns in question, the depreciable tax basis was reduced for estimated salvage in amounts which total about 6 per cent ("5.9% is a more accurate figure") of the whole property.

Following an examination of data furnished by PGE, Mr. Robinson developed that the

"* * * average (salvage rate) for the total plant during that period, 1940 to 1953, ha(d) been in excess of 22%."

It is through the following language of Mr. Robinson that the Commissioner substitutes his hindsight (1957) reconstructed value of salvage of 10% for PGE's in-advance-best-judgment estimated salvage of 5.9%.

"Now, in recognition of the fact that some of the current salvage, particularly that relating to copper, in recent years has been on so unusual a basis, and that recent growth may have distorted the salvage picture to some extent on account of the more than normal changes and the moving of equipment, I have in general in my calculations used only 10% as the salvage adjustment to be applied to the total investment. That would, in effect, be replacing 6% over-all used by the company per the returns." (Tr. 919–20).

"* * * the turnover methods are several in number, all adapting themselves to the type of data which we have in this case. There are two or three turnover approaches. The retirement ratio and the geometric mean are those most commonly used, and those which I used except that I did cross-check and further checked from my experience elsewhere [italics supplied] and compared the re-

sults with other results that I have found on other studies on the overall picture, and then recognized the 10% salvage that I mentioned a moment ago in my over-all calculations." (Tr. 925–6).

"* * * those factors * * * that the salvage is made up of two elements, one of which is more of a variable than the other, the scrap value at the end of the usefulness is nominal. *Perhaps the 6% figure estimated is not far off.* [Italics supplied.] The total salvage that we should recognize in our rates, however, is something somewhat in excess of that amount and I just used 10% in line with other properties we follow." (Tr. 924).

 As will be later pointed out (see note 20), when PGE prepared its tax returns for the years in question it was required to use sound judgment upon "facts known or reasonably anticipated" and then make an estimate of salvage value. It made its estimate at "5.9% for the whole property". It appears to this Court, in the language of the Commissioner's witness, that "perhaps the 6% estimate is not far off" and in light of the rapidly growing status of PGE and all factors then reasonably anticipated, the estimate was reasonable. Since the Commissioner "just used 10% in line with other properties (he) follows" that the Commissioner's reconstructed basis for salvage is arbitrary to PGE and therefore unreasonable. Salvage as estimated by PGE should be reinstated in the computation of taxes payable.

### Conclusion

In his brief the Commissioner says that PGE's

"* * * annual allowance for depreciation, unlike other deductions, cannot be measured by reference to any record of cash disbursements made during the year. Nevertheless, it is suggested that the allowance, however computed, represent only the depreciation loss or expense ac-

tually incurred during the year for which the claim is made. Of course, such a measurement necessarily eludes exactitude and commands the measure finally to rely upon *judgment*."

The Commissioner reminds us that:

"The ultimate facts upon which this *judgment* [italics supplied] must be exercised are all ascertainable objectively. These facts are:

"1) The date of acquisition of the property in question;

"2) Cost (or other depreciable basis);

"3) The nature and condition of the property;

"4) Its estimated useful life and remaining useful life;

"5) The reserve for depreciation already allowed or allowable; and

"6) The estimated salvage value of the property at the end of its useful life."

As stated by the Commissioner, in order for PGE to prevail upon its claim

" * * * to a greater allowance for depreciation than that determined by the Commissioner (it) must prove not only that the Commissioner's allowance for depreciation is arbitrary, improper and unreasonable and that the amount allowed is incorrect, but it must also establish by a preponderance of all of the evidence the ultimate facts supporting the correctness of the additional allowance claimed." [20]

Considering the above six ultimate facts in view of all of the evidence in the case, this Court finds and concludes that PGE has proven, by a preponderance of all of the evidence in the case, each of them in support of the correctness of its Annual Accrual and developed allowances for depreciation thereunder. In review, it is pointed out:

1) The dates of acquisition of PGE's property is agreed by stipulation;

2) The cost (or other depreciable basis) of PGE's depreciable properties has been stipulated to, except for the two minor items in dispute which have been resolved by the Court in PGE's favor as aforesaid;

3) There is no disputed issue as to the nature and condition of PGE's depreciable properties—the Commissioner's agents have been fully acquainted with PGE's properties over many years;

4) The estimated useful lives and remaining useful lives of PGE's properties as claimed by it has been clearly established and resolved in its favor by the Court as aforesaid;

5) The reserve for depreciation already allowed or allowable as claimed by PGE has been clearly established in its favor and resolved by the Court as aforesaid; and

6) The estimated salvage value of the property at the end of its useful life as claimed by PGE has been clearly established and resolved in its favor by the Court as aforesaid.

20. "The allowance of a deduction for depreciation is subject to the usual rule that the Commissioner's determination is presumptively, but not conclusively, correct. * * * [Citations omitted.] Thus, it is open to the taxpayer to show that the Commissioner's method of determining depreciation is questionable or is arbitrary, improper or unreasonable. To overcome the presumption in favor of the Commissioner, the taxpayer must, however, supply definite proof that the Commissioner's determination is incorrect. * * * [Citations omitted.] The proof should consist of facts known or *reasonably anticipated* [italics supplied] at the end of the year for which the depreciation is taken and not of facts that occur at some later time. * * * [Citations omitted.] The taxpayer must do more than merely allege a weakness or defect in the Commissioner's method of determining the depreciation allowance. We must support that contention with proof of the correct ultimate facts justifying the claimed allowance. * * * [Citations omitted.]" 4 Mertens, Law of Federal Income Taxation (Rev.), § 23.100, pp. 165–167.

From the foregoing, the Court concludes that the Commissioner's disallowances and his actions in seeking to substitute his method of straight-line average life depreciation for PGE's method of straight-line unit summation of depreciation is arbitrary, improper and unreasonable, and his computed amounts of Annual Accruals thereunder are inaccurate and incorrect as a matter of law. It follows that PGE is entitled to judgment for the refund of income taxes paid during the years in question. The parties have agreed that they will compute the amount of refund due upon the adjudication of the issues in dispute— now dealt with in this opinion.

Counsel for PGE is requested to submit proposed findings of fact, conclusions of law and judgment in accordance herewith.