ROBERT M. BRIGHAM AND VIRGINIA M. BRIGHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brigham v. Commissioner
Docket No. 12929-90
United States Tax Court
T.C. Memo 1992-413; 1992 Tax Ct. Memo LEXIS 437; 64 T.C.M. (CCH) 244; July 21, 1992, Filed *437 Decision will be entered under Rule 155. For Petitioners: Michael L. Coyle and Timothy McNamara. For Respondent: Denise Dengler and Chalmers Poston. KORNER
KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: By statutory notice of deficiency dated March 16, 1990, respondent determined with respect to petitioners' 1983 joint income tax a deficiency in the amount of $ 62,014.50; additions to tax under section 6653(a)(1)[1] and (2) in the amounts of $ 3,100.73 and 50 percent of the interest due on the deficiency, respectively; an addition to tax pursuant to section 6659 in the amount of $ 11,627.37; and liability for increased interest on a portion of the deficiency pursuant to section 6621(c). Respondent also disallowed petitioners' use of income averaging for 1983. In her notice of deficiency, respondent had determined that the amount *438 of the underpayment to which the additions to tax under sections 6659 and 6653(a)(2) and increased interest under section 6621(c) applied was $ 38,757.90. Respondent filed an amended answer in which she alleged that the underpayment for each of these items was $ 58,140.50. [2]
The issues for decision are: (1) Whether the fair market value of certain real property and its improvements that constituted a charitable contribution by petitioners in 1981 was greater than $ 30,000, and, if so, how much; and (2) whether petitioners are *439 liable for additions to tax under sections 6653(a)(1) and (2), and 6659, and increased interest pursuant to section 6621(c). [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The first stipulation for trial, second stipulation for trial, and their accompanying exhibits, to the extent not excluded at trial, are incorporated by this reference. Petitioners' [4] resided in Tequesta, Florida, at the time the petition in this case was filed. In 1979, George Giguere (hereinafter Giguere) constructed a 200,000 -- gallon water tower (tower) *440 to supply water to the businesses located in Pinewoods Industrial Park (Pinewoods), which he was developing in Torrington, Connecticut (Torrington or city). The tower obtained its water from a well by means of an electric pump. When the tower became operational, it leaked and was repaired by placing concrete under the tower and rewelding the base plate. The tower provided the only source of water for domestic use and for fire protection for Federal Business Forms (Federal) and petitioner's business, Torrington Brass and Steel Industries, Inc. (TBS), until September 1982. Giguere unsuccessfully sought to sell the tower to the city in the first half of 1980. On August 26, 1980, Giguere sold the tower, and 16,117 square feet of land (.37 acres) upon which it was located, to petitioner for $ 30,000. In August 1981, the property that Brigham had acquired from Giguere was appraised by W. Judson Reed, Jr., an appraiser for Aldieri Associates, at $ 193,000, as of that time. On or around July 10, 1981, Torrington began to service some of the water needs of Torrington Business Park, which the city had developed and which lies adjacent to Pinewoods. In June 1982, a 500,000-gallon water *441 tower built by Torrington, adjacent to the aforementioned 200,000-gallon tower, became operational. Its purpose was to provide fire protection for the businesses located in the two business parks, since the pressure of Torrington's main water line was insufficient to provide this service. The city received a certificate of substantial completion for the 500,000-gallon tower in November 1981. Torrington connected TBS to its water supply in September 1982, after which time the 200,000-gallon tower was emptied. The tower has not been used after this date, although it could have been put on line in a short period of time. By quitclaim deed dated December 10, 1981, and recorded on December 29, 1981, petitioner contributed the tower and 5,220 square feet of land upon which it was situated to the city of Torrington. Brigham did not give the entire property he had acquired from Giguere to Torrington. Instead, he retained 10,897 square feet of land and the right to use the tower to provide water and fire protection for TBS until TBS was connected to the city's system. At the time Brigham gave the tower, the city had no plans to operate the tower as either a primary or supplemental *442 source for fire protection after connecting TBS to its water system. On their 1981 income tax return, petitioners claimed a charitable deduction in the amount of $ 185,000 with respect to the gift of the tower and land to Torrington. Petitioners carried over $ 116,281 of the amount of the contribution to their 1983 joint income tax return. Respondent determined that petitioners were entitled to no charitable contribution carryover in 1983, since the value of the property at the time of the contribution in 1981 was only $ 30,000, and no charitable contribution carryovers to 1983 remained. The fair market value of the tower at the time of petitioner's gift in 1981 was $ 80,000. OPINION Issue 1: Fair Market Value of the Water Tower
The primary issue involved in this case is the fair market value of petitioner's property given to Torrington in December 1981. [5]This issue is a question of fact to be determined on the entire record, and the burden of proof with respect to it is on petitioners. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Skripak v. Commissioner, 84 T.C. 285, 320 (1985). The parties agree that the gift qualified *443 as a charitable contribution under section 170. Fair market value is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.
This case involves the clash between two methods of valuation. Petitioners claim that the value of the gift on the date of its contribution in 1981 was $ 185,000. Petitioners rely on Reed's appraisal of the property, which employed the cost of reproduction method of valuation. In valuing the property, Reed used the tower's cost of construction and adjusted that figure for inflation and depreciation. *444 Respondent on the other hand, offering no expert report or testimony, asserts that the price petitioner paid to acquire the property in August 1980 establishes the upper limit for the gift's fair market value. Petitioners initially argue that they must prevail since they produced an expert report and respondent did not, citing Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441 (1980). We disagree. At most, Buffalo Tool & Die Mfg. Co. stands for the proposition that a written appraisal is helpful in determining value, but it does not necessitate production of such a report. This Court has refused to be "bound by the opinion of any expert witness when that opinion is contrary to our judgment." Parker v. Commissioner, 86 T.C. 547, 561 (1986). Thus, we "may embrace or reject expert testimony, whichever, in our best judgment, is appropriate." Chiu v. Commissioner, 84 T.C. 722, 734 (1985). Further, we alluded to the foregoing principles in Cupler v. Commissioner, 64 T.C. 946, 955-956 (1975), in rejecting the taxpayers' contention that respondent's failure to produce expert testimony rebutting *445 their expert's testimony entitled them to a decision in their favor. Petitioners next assert that Dial v. Commissioner, 24 T.C. 117 (1955), supports their contention that respondent's failure to submit an expert report is fatal to her determination of the gift's fair market value. In that case, respondent determined that the fair market value of property exceeded the price the taxpayers paid for it. However, the taxpayers adduced evidence from which the Court concluded that "it was incumbent on the respondent to come forward with some additional evidence to buttress * * * [her] bare determination of the fair market value." Dial v. Commissioner, supra at 127. Dial is clearly distinguishable from this case. Here, respondent asserts that the sales price reflected the gift's fair market value. Further, respondent's reliance on the sales price of the property in valuing the gift shows that her determination does not constitute a "bare" determination. We conclude that respondent's failure to produce an expert report, in the circumstances of this case, does not in itself allow petitioner to prevail on the issue of valuation. We, however, *446 find fault with Reed's application of the cost of reproduction method of valuation. This Court does not accept this method of valuation without "proof that the value thus determined was the actual value" on the valuation date. See Strong, Hewat & Co. v. Commissioner, 3 B.T.A. 1035, 1038 (1926); Provitola v. Commissioner, T.C. Memo. 1990-523, affd. without published opinion    F.2d    ; (11th Cir. 1992); Rainier Companies v. Commissioner, T.C. Memo. 1977-351; Stratton v. Commissioner, T.C. Memo. 1969-50, affd. per curiam 422 F.2d 872 (2d Cir. 1970) (there must be a "relationship between reproduction cost and fair market value"). "Utilizing the cost of reproduction as the measure of fair market value generally assumes that the property being valued is worth replacing." Rainier Companies v. Commissioner, supra.
Respondent asserts that the property was not worth replacing. She claims that the tower had certain defects in that it leaked, it did not have cathodic protection, and it relied on an electric pump without a standby generator in an area where power *447 outages were common. Furthermore, the 500,000-gallon tower, to which TBS was connected in September 1982, replaced the fire protection function of the 200,000-gallon tower. We agree with respondent's conclusion that the cost of replacement method of valuation as applied by Reed did not reflect the fair market value of the tower on the date of its donation. Reed's appraisal failed to establish a correlation between replacement cost and the fair market value of the property. Reed predicated his determination of value on the use of the tower as a primary source of water for TBS and Federal. [6] However, he did not account for the change in use of the tower after the city connected TBS to its water system. Reed, on cross-examination, maintained that the fact that the city might use the property as a supplemental unit, or not at all, would not affect the value of the property as of the date it was gifted to Torrington. We disagree. We note that "The use to which donated property is put (or by implication, the failure to put property into use) is relevant" in determining the fair market value of property. Chiu v. Commissioner, supra at 736. The record establishes *448 that the tower would be used as a primary source of water for TBS only until it was connected to the city's system. Thereafter, the record shows that there was no intention to keep the tower in actual use. In this regard, Richard D. Cosgrove, the city planner of Torrington at the time that the property was donated, testified that Torrington had no intention of using the system as a supplemental tower. We believe that, since the city was in the process of developing an alternative source of water supply for TBS and Federal, the value of the tower for these two businesses would have *449 been adversely affected. Reed testified that, since the city's water tower was not operational at the time of the donation, it had no bearing on the fair market value of petitioner's tower. We note that the tower had value for TBS and Federal at the time petitioner acquired the structure because it provided the business' sole source of water. However, since Torrington was in the process of completing a water tower that could service TBS' and Federal's fire protection needs and since the city could supply their other water needs, the value of the tower for any purchaser would have been less than the value obtained through Reed's replacement cost method, particularly since on the date of the gift the completion of Torrington's tower was certain.[7] Furthermore, petitioner apparently judged the city's water service superior, since he intended from the time he had acquired the tower to donate it to Torrington as soon as TBS was connected to the city's water system. [8] Thus, we can see no reason why the value of the tower to TBS or Federal would not have incorporated the certainty of an alternative source of water supply as of the date of the gift, or shortly thereafter. [9] Cf. Estate of Gilford v. Commissioner, 88 T.C. 38, 52 (1987) *450 (stating that prospective events may be referenced in valuing property).
*451 We believe, however, that the tower had a value beyond its salvage value. The record provides implicit, though not compelling, support for the position that the city valued the tower as a back-up for the 500,000-gallon tower it had constructed. We note that, after the city had rejected purchasing the tower, the city resolved to accept the gift of the tower in exchange for connecting TBS to its system. We note also that the city had not removed the tower at the time this case was tried, nearly 10 years after it had been given to the city, and that the president of the Torrington Water Co. testified that in his opinion the tower could be made operational in a short period of time. We believe that the record establishes that, after TBS became connected to the city's water system, the city intended to hold the tower in reserve. Respondent asserts that the sales price of the property in August 1980 established the fair market value of the property. The general rule is that a recent arm's-length sale of property is probative of its fair market value. "The most reliable evidence of value * * * [is] sales of the same property within a short period of time prior to the valuation date." *452 Chiu v. Commissioner, 84 T.C. at 734; see also Estate of Kaplin v. Commissioner, 748 F.2d 1109, 1111 (6th Cir. 1984), revg. T.C. Memo 1982-440 ("In determining the fair market value of property, little evidence could be more probative than the direct sale of the property in question"); Tripp v. Commissioner, 337 F.2d 432, 434-435 (7th Cir. 1964), affg. T.C. Memo. 1963-244. However, a prior sales price is not wholly determinative of value. Chiu v. Commissioner, supra (market in which property had been sold must have been appropriate); Tripp v. Commissioner, supra (the value must not have been affected by events subsequent to the sale); Baker v. Commissioner, T.C. Memo. 1990-263. In the instant matter, the gift and approximately an additional 10,000 square feet of land sold for $ 30,000 in August 1980, but petitioners claimed that the property petitioner donated had a value of $ 185,000 when contributed to Torrington in December 1981. No evidence was adduced showing that the property increased in value during that period; *453 instead, petitioners assert that the sales price of the property represented a bargain price. In support of their characterization of the sales price, petitioners rely primarily on the testimony of petitioner and Reed, which consisted of assertions that the purchase price was below market. Some portions of the record provide support for their contention. Given that the market for the property according to its then current use was limited to a small number of entities, that Torrington was developing an industrial park on land adjacent to Pinewoods, and that it planned to build a larger water tower, Giguere may have been motivated to sell the tower at a significant discount relative to its fair market value.
We believe that the fair market value of the property was not its replacement cost, as determined by Reed, since Torrington was not going to continue to use it as a source of fire protection after TBS was connected to the city's water system. However, we also believe that the tower's fair market value exceeded the property's purchase price. Based upon the entire record and using our best judgment, we have found that the fair market value of the property was $ 80,000. Issue *454 2: Additions to Tax
Respondent determined that petitioners were liable for an addition to tax pursuant to section 6659, which applies to an underpayment attributable to a valuation overstatement. A valuation overstatement arises where the value of any property, "claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation". Sec. 6659(c)(1); Chou v. Commissioner, T.C. Memo. 1990-90, affd. without published opinion 937 F.2d 611 (9th Cir. 1991). This requirement is satisfied, since the value of the charitable contribution reported in 1981, $ 185,000, is over 200 but less than 250 percent of the correct valuation, $ 80,000. The amount of the addition to tax under this provision is the product of multiplying the underpayment for the year attributable to the valuation overstatement by the applicable percentage, which depends on the size of the valuation overstatement. [10] See sec. 6659(a) and (b); Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988); Chou v. Commissioner, supra. Since the value claimed by petitioners *455 exceeded the correct amount by 200+ percent, the applicable percentage is 20 percent. See sec. 6659(b). *456 Respondent may waive the addition "on a showing by the taxpayer that there was reasonable basis for the valuation * * * claimed on the return and that such claim was made in good faith." Sec. 6659(e). In this case, respondent has not granted petitioners a waiver of section 6659, and, arguably, this refusal is subject to judicial review under the abuse of discretion standard. See Aero Warehouse Corp. v. Commissioner, T.C. Memo. 1989-180, affd. without published opinion 902 F.2d 1558 (3d Cir. 1990); cf. Mailman v. Commissioner, 91 T.C. 1079 (1988) (applying this standard of review to respondent's refusal to waive the addition to tax for substantial understatement of tax liability under section 6661(c)). The issue is whether respondent's "discretion has been exercised arbitrarily, capriciously, or without sound basis in fact". In deciding this issue, "We should not substitute our judgment for * * * [respondent's]." Mailman v. Commissioner, supra at 1084. Based on the record, we conclude that respondent did not abuse her discretion in determining that no reasonable basis existed for the valuation overstatement. *457 We note that in this case respondent could find that petitioner's reliance on Reed's appraisal was unreasonable. Brigham paid only $ 30,000 for the property that constituted the gift and additional land in August 1980, only 18 months prior to the valuation date of the gift, and the record does not show that petitioner's acquisition of the tower constituted a bargain purchase. Furthermore, Reed's appraisal, relying on the cost of replacement method of valuation, did not incorporate all relevant factors in determining the value of the tower. Thus, we find that respondent's refusal to waive this addition to tax was neither arbitrary, capricious, or without sound basis in fact. Respondent also determined that petitioners were liable for increased interest pursuant to section 6621(c), formerly section 6621(d). Section 6621(c) applies to an underpayment exceeding $ 1,000 attributable to tax-motivated transactions. For purposes of section 6621(c), tax-motivated transactions include any valuation overstatement as defined in section 6659(c). Sec. 6621(c)(3)(A)(i). We conclude that section 6621(c) applies to the extent of the underpayment as determined herein. Respondent further determined *458 that petitioners were liable for additions to tax for negligence pursuant to section 6653(a)(1) and (2). Negligence is the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners have the burden of showing that they were not negligent. Rule 142(a). Good faith reliance on the advice of an expert can negate the finding of negligence. Ewing v. Commissioner, 91 T.C. 396, 423 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991). Valuation is an inexact science. In the circumstances of this case, we are persuaded that petitioners were not negligent with respect to reporting their charitable deduction of the tower. We believe that petitioners were justified in relying on Reed's appraisal value in determining the value of their gift in 1981. The record establishes that petitioner needed the tower to supply water to his business and that the tower serviced TBS' water needs up and until TBS was connected to the city's water system. Further, petitioner believed that the acquisition of the *459 tower from Giguere was a bargain purchase, and we found him to be a credible witness. We note that petitioner sought out an expert who appeared qualified and competent to value the property. The record does not indicate that the relevant information regarding the tower was not made available to the expert. Although we did not accept petitioners' determination of value of the gift, we are persuaded, based on the record, that petitioners' actions satisfy the reasonable and ordinarily prudent person standard. See Rhoades v. Commissioner, T.C. Memo. 1988-279; Biagiotti v. Commissioner, T.C. Memo. 1986-460. Thus, petitioners are not liable for additions to tax pursuant to section 6653(a)(1) and (2). Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Respondent determined that the amount of the underpayment due to negligence for purposes of sec. 6653(a)(1) was $ 62,014.50. The record has failed to enlighten the Court as to why respondent asserts that the amount of the underpayment for purposes of secs. 6653(a)(2), 6659, and 6621↩, alleged in the amended answer, is $ 58,140.50. We note that the only adjustment to income in the notice of deficiency for 1983 was a denial of a charitable deduction carryover, in the amount of $ 116,281.
3. Petitioners did not allege in their petition that respondent had erred in her disallowance of income averaging for 1983. By this omission, they are deemed to have conceded the issue. See Rule 41(b)(4).↩
4. Petitioner in the singular, and Brigham, shall refer to petitioner Robert M. Brigham.↩
5. Petitioners will be entitled to take a charitable deduction in 1983 with respect to their gift of the tower to the city in 1981 only to the extent that the fair market value of the gift exceeds $ 92,384, which was the amount of the tower's value used for charitable deduction purposes for 1981 and 1982.↩
6. The record indicates that the market for the tower was limited to TBS, Federal, Torrington, and the Torrington Water Co., a privately owned utility, and that the tower, on the date of its donation, was supplying the water needs of only TBS and Federal. The record does not indicate whether any other businesses could have been serviced by the tower, nor do either of the parties claim that the market for the tower was not so limited.↩
7. Assuming, arguendo, that TBS could have used the tower as a primary source of water and fire protection indefinitely, that fact alone does not establish that value of the tower was its replacement value, since on the date of the donation only a short period of time existed before the city would be able to satisfy the water needs of TBS. In this regard, we note that neither petitioners nor petitioners' expert investigated any other means by which TBS could have satisfied its water requirements for the intervening period from the time of the donation of the tower to the time TBS was connected to the city's system. A similar analysis would apply to Federal's interest in the tower. Furthermore, we do not believe that replacement cost represents the value that the city may have placed upon the tower, since the record indicates that it did not intend to use the tower as a primary source of fire protection after TBS was connected to the 500,000-gallon tank. ↩
8. Although respondent asserted that the tower had certain defects, the record does not establish this claim primarily because respondent failed to produce expert testimony to this effect. The record does show that the Torrington Water Co. was uninterested in acquiring the tower and recommended that the city, for reasons which included what it perceived to be defects in the construction of the tower, not purchase the tower. ↩
9. We believe that TBS would have investigated the cost of other methods to supply that need for the short time between the date of the gift and TBS' connection to Torrington's water system.↩
10. Respondent in her notice of deficiency determined that the amount of the underpayment attributable to the valuation overstatement was $ 38,757.90, and in her amended answer she increased the amount to $ 58,140.50. The issue arises whether this action by respondent affects the burden of proof on this addition to tax. Rule 142(a) places the burden of proof on respondent with respect to "any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer". Respondent's increase in the underpayment to which this addition to tax is applicable constitutes an increase in deficiency. Aero Warehouse Corp. v. Commissioner, T.C. Memo. 1989-180, affd. without published opinion 902 F.2d 1558 (3d Cir. 1990). Analagous reasoning as to the burden of proof on the increased underpayment asserted in the amended answer with respect to the addition to tax under sec. 6659 applies to the burden of proof on the increased underpayment alleged in the amended answer for sec. 6621(c) and for sec. 6653(a)(2)↩. To the extent that our findings and holdings herein support the increase in the additions to tax and increased interest in respondent's amended pleadings, they will be allowed, but not to exceed the amounts which respondent has claimed.